849 So.2d 740 (2003)
James D. SIMPSON, et ux.
v.
Robert D. GRIMES, et al.
No. 2002-0869.
Court of Appeal of Louisiana, Third Circuit.
May 21, 2003.
Rehearing Denied August 6, 2003.
*741 Robert G. Nida, Gold, Weems, Bruser, etc., Alexandria, LA, for Plaintiffs/Appellants, James D. Simpson, Juanita H. Simpson.
Bruce Victor Schewe, Phelps, Dunbar, L.L.P., New Orleans, LA, for Defendants/Appellees, Robert D. Grimes, Argent Investment Services, Inc.
Court composed of ULYSSES GENE THIBODEAUX, SYLVIA R. COOKS, JOHN D. SAUNDERS, BILLIE COLOMBARO WOODARD and MARC T. AMY, Judges.
JOHN D. SAUNDERS, Judge.
The plaintiffs filed suit for losses sustained in a self-directed IRA account. The defendants filed exceptions of no right and no cause of action, as well as an exception of prematurity due to an arbitration provision contained in the application to open the account. The trial court granted the exceptions and issued a stay of the proceedings while the matter continued in arbitration. The judgment was rendered final and appealable pursuant to La.Code Civ.P. art. 1915(B). The plaintiffs appeal. We reverse and remand.

*742 Factual and Procedural Background
Juanita and James D. Simpson allege that the defendants, Robert D. Grimes and Argent Investment Services, Inc. (formerly known as TCL Securities, Inc.), are liable for losses to their Individual Retirement Account. They contend that in May of 1996 they established an account with TCL Securities under Mr. Simpson's name, with Robert Grimes acting as a broker. In a petition filed October 23, 2001, they allege they "placed approximately $200,000.00 in the IRA Account with TCL with instructions that the money was to be invested for capital appreciation or growth." The funds were distributed between a number of mutual funds.
In early 1999 the plaintiffs received a form from Mr. Grimes entitled "Trading Authorization-Limited to Purchases and Sales of Securities," which, upon signing by the Simpsons, would allow Mr. Grimes to buy, sell, and trade securities without seeking specific authorization from the Simpsons. They maintain that they did not sign this form and that the signature appearing on the copy of this form presented at trial by TCL is false.
The plaintiffs further allege that Mr. Grimes, acting under the apparent authority of this "Trading Authorization," began buying and selling securities on their account. As a direct result of Mr. Grimes' actions, the plaintiffs maintain that their IRA dramatically declined in value, experiencing losses exceeding the general decline of the market during that period.
Mr. and Mrs. Simpson filed suit, alleging that Mr. Grimes breached his fiduciary duty in a number of regards, and also that the actions of Mr. Grimes and TCL, as his employer, "constitute deceptive and unfair trade practices pursuant to La.R.S. 51:1401 in that those acts were unethical, unscrupulous and substantially injurious to petitioners as consumers of financial services." They sought damages related to the losses associated with their account, as well as damages related to their anxiety over the loss of the funds.
Mr. Grimes and Argent filed a number of exceptions, alleging that the trial court lacked jurisdiction over the matter due to an arbitration clause contained in the account application, that the matter was premature due to the arbitration clause, and also that Mrs. Simpson lacked a cause of action or right of action as the account was held by Mr. Simpson. The trial court granted the exceptions, staying the proceedings in the district court and referring the matter to arbitration. The ruling was designated a final judgment pursuant to La.Code Civ.P. art.1915.
The plaintiffs assert the following assignments of error:
1. The trial court erred in granting the defendants' declinatory exceptions and dilatory exceptions based upon the arbitration provisions of the May 7, 1996 contract.
2. The trial court erred in granting the defendants' peremptory exceptions in ruling that Juanita H. Simpson is without a cause or right of action to assert the claims involved in this litigation.
DISCUSSION
In 1925 congress enacted the Federal Arbitration Act (FAA), 9 U.S.C. § 1 et seq. The purpose of the FAA was to make agreements to arbitrate disputes enforceable to the same extent as other contracts, and to counter the historic judicial hostility towards arbitration. See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). After the enactment of the FAA, and several key cases decided by the United States Supreme Court, the Court began to *743 recognize a strong presumption in favor of arbitration and the enforcement of arbitration agreements. This strong presumption is firmly established in federal law and jurisprudence, and is also becoming strongly favored in state law.
Louisiana law provides for the validity of arbitration agreements in La.R.S 9:4201, which provides:
A provision in any written contract to settle by arbitration a controversy thereafter arising out of the contract, or out of the refusal to perform the whole or any part thereof, or an agreement in writing between two or more persons to submit to arbitration any controversy existing between them at the time of the agreement to submit, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
The Federal Arbitration Act, 9 U.S.C. § 1, et seq., provides a similar provision for enforcement of arbitration agreements. Section 2 of the FAA states:
A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
United States Supreme Court jurisprudence has consistently presented a strong and growing federal policy favoring arbitration of disputes and the enforcement of arbitration clauses and the FAA. See, e.g., Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995); Gilmer, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26; Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Specifically, in Allied-Bruce the Supreme Court held that the FAA governs all contracts falling within the scope of the Commerce Clause and Congress's authority under it. In Moses H. Cone the court further stated its support for the FAA and enforcement of contractual agreements to arbitrate. "The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitral issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or like defense to arbitrability." Moses H. Cone, 460 U.S. at 24-25, 103 S.Ct. 927. "The Federal Arbitration Act (FAA) has been interpreted by the Supreme Court as mandating the enforcement of all arbitration agreements which `evidence a transaction involving commerce, unless they are revocable on contractual grounds.' Southland Corp., v. Keating, 465 U.S. 1, 11-12, 104 S.Ct. 852, 858-59, 79 L.Ed.2d 1 (1984)." Lytle v. CitiFinancial Services, Inc., 810 A.2d 643, 654 (Pa.Super.2002).
Waiver of Constitutional Rights
The plaintiffs argue that the arbitration provision contained in the May 7, 1996 contract, and in fact any arbitration clause, waives a parties' constitutional right to seek relief in court. They allege that, for a contractual waiver of constitutional rights to be enforceable, it must be brought to the attention of the party against whom it is to be enforced.
In the present case the arbitration provision, while located on the back of the application, is set out in all capital letters. The remainder of the text on the back of the application is in regular font. Despite this fact however, the dense text, relatively *744 small font, and the placement of the arbitration provision almost directly in the middle of the page prevent the provision from being particularly noticeable. The provision in paragraph 17 provides:
17.  ARBITATION [SIC] IS FINAL AND BINDING ON THE PARTIES.
 THE PARTIES ARE WAIVING THEIR RIGHTS TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL.
 PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDINGS.
THE ARBITRATORS' AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OF THE RULING BY THE ARBITRATIONS IS STRICTLY LIMITED.
 THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILIATED WITH THE SECURITIES INDUSTRY.
THE CUSTOMER AGREES AND BY CARRYING AND [SIC] ACCOUNT FOR THE CUSTOMER, TCLSI AND MORGAN KEEGAN AGREE THAT ALL CONTROVERSIES WHICH MAY ARISE BETWEEN THE PARTIES CONCERNING ANY TRANSACTION OR CONSTRUCTION, PERFORMANCE, OR BREACH OF THIS OR ANY OTHER AGREEMENT BETWEEN U.S. PERTAINING TO SECURITIES AND OTHER PROPERTY, WHETHER ENTERED INTO PRIOR, ON OR SUBSEQUENT TO THE DATE HEREOF, SHALL BE DETERMINED BY ARBITRATION, ANY ARBITRATION UNDER THIS AGREEMENT SHALL BE CONDUCTED PURSUANT TO THE FEDERAL ARBITRATION ACT AND THE LAWS OF THE STATE OF LOUISIANA BEFORE THE AMERICAN ARBITRATION ASSOCIATION, OR BEFORE THE NEW YORK STOCK EXCHANGE, INC. OR AN ARBITRATION FACILITY PROVIDED BY ANY OTHER EXCHANGE OF WHICH TCLSI AND/OR MORGAN KEEGAN IS A MEMBER, OR THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. OR THE MUNICIPAL SECURITIES RULE MAKING BOARD AND IN ACCORDANCE WITH THE RULES OBTAINING OF THE SELECTED ORGANIZATION. THE CUSTOMER MAY ELECT IN THE FIRST INSTANCE WHETHER ARBITRATION SHALL BE BY THE AMERICAN ARBITRATION ASSOCIATION, OR BY AND EXCHANGE OR SELF REGULATORY ORGANIZATION OF WHICH TCLSI AND/OR MORGAN KEEGAN IS A MEMBER, BUT IF THE CUSTOMER FAILS TO MAKE SUCH ELECTION, BY REGISTERED LETTER OR TELEGRAM ADDRESSED TO TCLSI AT, TCLSI'S MAIN ADDRESS, BEFORE THE EXPIRATION OF TEN DAYS AFTER RECEIPT OF A WRITTEN REQUEST FROM AIM OR STEPHENS TO MAKE SUCH ELECTION, THEN TCLSI AND/OR MORGAN KEEGAN MAY MAKE SUCH ELECTION THE AWARD OF THE ARBITRATORS, OR OF THE MAJORITY OF THEM, SHALL BE FINAL, AND *745 JUDGEMENT UPON THE AWARD RENDERED MAY BE ENTERED AND ENFORCED IN ANY COURT, STATE OR FEDERAL, HAVING JURISDICTION.
Additionally, however, the consumer is notified of the existence of an arbitration provision immediately above the signature line on the New Accounts Application. Directly above this signature line, where the customer's personal and account information is contained, another provision in bold type and in "all caps" provides:
I/WE UNDERSTAND THAT THE CUSTOMER AGREEMENT ON THE REVERSE OF THIS APPLICATION CONTAINS, IN NUMBERED PARAGRAPH 17, A PRE-DISPUTE ARBITRATION CLAUSE REQUIRING ALL DISPUTES UNDER THIS AGREEMENT TO BE SETTLED BY BINDING ARBITRATION. BY SIGNING BELOW THE CUSTOMER ACKNOWLEDGES RECEIVING A COPY OF THIS AGREEMENT.
Mr. Simpson's signature and the date "5/7/96" are inscribed immediately beneath the above provision.
We find no requirement that the defendants were obliged to bring the arbitration clause to Mr. Simpson's attention beyond these two statements, which are directed to the potential customer. See Blount v. Smith Barney Shearson, Inc., 96-0207 (La.App. 4 Cir. 2/12/97); 695 So.2d 1001. In fact, in Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996), the United States Supreme Court found that the presumptions of the FAA, discussed above, preempted a state statute requiring special notice requirements before an arbitration clause could be enforced. Finally, the document contains Mr. Simpson's signature. In Stadtlander v. Ryan's Family Steakhouses, Inc., 34,384, p. 9 (La.App. 2 Cir. 4/4/01); 794 So.2d 881, 889, writ denied, 01-1327 (La.6/22/01); 794 So.2d 790, the second circuit explained: "[I]t is well settled that a party who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that she did not read it, that she did not understand it, or that the other party failed to explain it to her."
For the above reasons we find no merit to this argument.
Louisiana Unfair Trade Practices Act
The plaintiffs also maintain that, since they have asserted a cause of action under the Louisiana Unfair Trade Practices Act, La.R.S. 51:1401, et seq., the arbitration clause is rendered invalid. They direct this court's attention to La.R.S. 51:1418, which provides in pertinent part:
§ 1418. Jurisdiction
C. The following terms of a writing executed by a consumer are invalid with respect to consumer transactions or modification thereof; (1) that the law of another state will apply; (2) that the consumer consents to the jurisdiction of another state; or (3) any term that fixes venue.

(emphasis added).
It is this final portion of Section C that the plaintiffs contend renders the arbitration clause unenforceable as it "fixes venue." It is the plaintiffs' contention that "if it is illegal for a contract to provide that the consumer consents to jurisdiction in the courts of another state, it certainly would be illegal to make the consumer consent to jurisdiction before a non-judicial tribunal unaffiliated with any state."
Although the plaintiffs allege unfair trade practices pursuant to La.R.S. 51:1401, this type of action under the Louisiana Unfair Trade Practices Act has been found inapplicable to cases involving securities. See Feiber v. Cassidy, 98-0405 *746 (La.App. 1 Cir. 12/28/98); 723 So.2d 1101; Taylor v. First Jersey Securities, Inc., 533 So.2d 1383 (La.App. 4 Cir.1988). Furthermore, United States Supreme Court jurisprudence unquestionably indicates that the FAA's presumption of arbitrability preempts any state law to the contrary. See Southland Corp., 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1.
Accordingly, we find that this argument is also without merit.
Contract of Adhesion
Next, the plaintiffs argue that the arbitration provision contained in the Argent application is unenforceable as it is an unconscionable contract of adhesion. They point out that the document is a standard form contract containing a "Cash Account Agreement" on the reverse side of the document, printed in fine print of less than 7 point type. In Golz v. Children's Bureau of New Orleans, 326 So.2d 865 (La. 1976), the supreme court defined contracts of adhesion as follows:
Broadly defined, a contract of adhesion is a standard contract, usually in printed form, prepared by a party of superior bargaining power for adherence or rejection of the weaker party. Often in small print, these contracts sometimes raise a question as to whether or not the weaker party actually consented to the terms.
Additionally, Louisiana Civil Code article 2056, enacted in 1984, cited Golz in the Revision Comments to the Article. Revision Comment (c) provides that "[u]nder the Article, a contract of adhesion must be interpreted against the party who prepared it."
In further support of their contention that this agreement represents an unconscionable contract of adhesion, the plaintiffs cite Sutton's Steel & Supply, Inc., v. BellSouth Mobility, Inc., 2000-511 (La. App. 3 Cir. 12/13/00), 776 So.2d 589, writ denied, 01-152 (La.3/16/01), 787 So.2d 316. In Sutton's Steel a group of plaintiffs filed suit against BellSouth alleging breach of contract. BellSouth argued that the claims were subject to arbitration and sought to compel arbitration and stay the proceedings. This court upheld the ruling of the trial court, denying the defendant's motion to compel on the basis that the arbitration provision contained in Bell-South's standard form contract was unduly burdensome and extremely harsh. We specifically noted that the arbitration provision in that matter bound the plaintiffs to arbitration, while the defendant reserved the option to pursue non-arbitral remedies, including court action.
The defendants argue that the present case is distinguishable from the case of Sutton's Steel, therefore, that decision is not controlling in this matter. They contend that Sutton's Steel dealt with the unusual situation where one party to the contract has "monopoly or near-monopoly power and presents unfair and one-sided `take it or leave it' choices to persons who, in fact, cannot `leave it'." The defendants point out that the arbitration clause in the agreement from BellSouth was "extremely harsh" and that BellSouth was not bound to arbitrate. They allege that the agreement between Simpson and TCL does not contain those inequities.
Specifically, the defendants claim that, unlike Sutton's Steel, both parties to the Argent agreement are bound to arbitrate disputes that may arise between them. They further contend that both parties waived their right to a trial by jury. Finally, the defendants argue that both parties retain the right to seek a court's modification of the award of the arbitrators. They maintain that there are no provisions in the Argent agreement like the clauses we viewed as problematic in Sutton's Steel.
*747 The plaintiffs dispute the defendants' contention that Sutton's Steel involved a party with monopoly or near monopoly power. They note that the contract in that matter was not one for standard residential or commercial telephone service. It was a contract for cellular phone service. They argue that the cellular communications industry is highly competitive and BellSouth enjoys no monopoly, or even near monopoly, in this area of communication. As a result, the plaintiffs argue that the decision of this court in that matter was not based on the circumstance that BellSouth Mobility enjoyed a monopoly status. Additionally, the plaintiffs contend that all factors which were found to render the BellSouth Mobility contract enforceable do exist in the present case. They specifically note that paragraph 24 of the agreement allows Argent to unilaterally modify any and all specific terms of the agreement, including the arbitration provision. Paragraph 24 of the agreement provides:
This agreement and other written forms and agreements executed by Customer collectively constitute the entire agreement between TCLSI and/or Morgan Keegan and Customer with respect to any brokerage accounts opened on Customer's behalf, except that TCLSI and/or Morgan Keegan may amend this Agreement upon written mailing notice to Customer. Either TCLSI or Morgan Keegan or Customer may terminate this agreement any time effective upon mailing written notice to the other. If the Agreement is terminated, Customer will continue to be responsible for an obligation incurred by customer prior to termination.
(emphasis added).
The plaintiffs argue that this paragraph renders Argent's promise to be bound by the arbitration provision completely illusory. Therefore, contrary to the claims of the defendant, both parties are not necessarily bound to arbitrate disputes that may arise between them and Argent's apparent waiver of its right to a trial by a jury is revokable by Argent at any time. The plaintiffs assert that these factors render the agreement in the present case strikingly similar to the agreement this court found unenforceable in Sutton's Steel.
As stated above, both federal and state law recognize a presumption in favor of arbitration, and against finding a waiver or default, has been recognized in Louisiana jurisprudence and legislation. However, despite that presumption arbitration agreements are not blindly validated where there is evidence that they contain material faults which render them unconscionable and unduly burdensome to one party. In Sutton's Steel, this court found that the arbitration agreement in question was unduly burdensome to the consumer, and lacked sufficient mutuality, rendering the adhesionary contract unconscionable and, therefore, unenforceable on a contractual basis.
Importantly, while BellSouth attempts to bind the plaintiffs to arbitration, it reserves unto itself the option of pursuing other remedies, including court action. Specifically, in paragraph (b), BellSouth clearly excludes from arbitration any "ATTEMPT TO COLLECT A DEBT OWED TO [BELLSOUTH] BY THE [PLAINTIFFS]." Thus, BellSouth has reserved unto itself the right to pursue an open account debt and collect the attorney fees and costs allowed in such an action by La.R.S. 9:2781 while, at the same time, limiting the plaintiffs to only the relief available under the arbitration clause for any claims they may have.
....

*748 Such disproportionate dispensation by BellSouth of rights and remedies is arbitrary and is lacking in good faith. In fact, the promise by BellSouth to arbitrate is totally illusionary and is actually no promise at all. We do not find, under these circumstances, the consent requisite for the enforcement of this provision, and, thus, we decline to recognize this adhesionary provision.
Sutton's Steel, 776 So.2d at 596-97.
We agree with the plaintiffs on this matter. It cannot realistically be argued that BellSouth Mobility enjoys anything resembling monopoly status in the cellular communications industry. In the Sutton's Steel opinion we mentioned that adhesionary contracts are of particular concern in the context of parties with monopoly like power. We specifically noted, however, that problematic contracts of adhesion may also arise in connection with activities that are less regulated, or not regulated at all. We find no reference in Sutton's Steel to support a proposition that our holding in that case was dependent upon, or even based upon, a monopoly or near-monopoly situation.
Of particular concern in the BellSouth contract, as is correctly noted by the plaintiffs, was the striking lack of mutuality present in the terms of the arbitration provision. We find a similar lack of mutuality in the contract between Argent and Mr. Simpson. While BellSouth explicitly retained its right to resolve its disputes in a variety of settings, including the courts, the Argent agreement signed by Mr. Simpson manages to achieve the same goal through clever subterfuge. By retaining the right to modify at will any and all provisions of the agreement in question, Argent allows itself an escape hatch from its promise to be similarly bound to arbitrate all disputes arising between the parties. Argent's ability to modify the specific terms of the agreement at will is not shared by the potential customer signing the agreement.
While the doctrine of mutuality exists in Louisiana contract law, there is very little jurisprudence discussing the theory. Generally, where terms of a contract were not bargained for by the parties, and any benefits conferred by it are merely gratuitous or illusionary, the contract term lacks mutuality of obligation. In Leger v. Tyson Foods, Inc., 95-1005, p. 5 (La.App. 3 Cir. 1/31/96), 670 So.2d 397, 401, a panel of this court recognized the importance of mutuality of obligation in valid contracts. "A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished. La.Civ.Code art.1906. There are four necessary elements for a valid contract: capacity, consent, object, and lawful cause. La.Civ. Code arts.1918, 1927, 1966, 1971. In other words, the parties must have the capacity to contract and give their consent freely for a certain object, and the contract must have a lawful purpose. Id. Both parties must be bound in order for there to be a contract." (emphasis added).
The concept of mutuality of contract is recognized in most jurisdictions. Therefore, we find it helpful look to outside sources for a more detailed discussion of contract mutuality, specifically in terms of arbitration provisions within contracts. In the case of The Money Place, LLC v. Barnes, 349 Ark. 411, 414, 78 S.W.3d 714, 716-17 (2002), the Arkansas Supreme Court addressed the necessity of mutuality within arbitration provisions. In Barnes, the plaintiff filed suit against a paydayloan/deferred-check establishment alleging the loans violated the state's usury laws. The defendant filed a motion to compel arbitration based on arbitration clauses contained in the Deferred Presentment Agreements.
*749 Under the terms of the agreements in that case The Money Place retained the right to pursue all civil remedies when a check is returned, while the customer was required to submit all disputes arising between the parties to binding arbitration. There the court stated:
Mutuality of contract means that an obligation must rest on each party to do or permit to be done something in consideration of the act or promise of the other; that is, neither party is bound unless both are bound.... Because there is no mutuality, the arbitration provision is not valid and is not subject to enforcement under any arbitration act.
Id. at 418, 718.
We note that some courts have held that not all lack of mutuality in an adhesive arbitration agreement is unconscionable and invalid. The California Supreme Court held that "a contract can provide a `margin of safety' that provides the party with superior bargaining strength a type of extra protection for which it has a legitimate commercial need without being unconscionable." Stirlen v. Supercuts, Inc., 51 Cal.App.4th 1519, 1536, 60 Cal.Rptr.2d 138, 148 (Cal.App. 1 Dist.1997). The court, however, was referring specifically to situations of patent infringement and noncompete agreements. We find no similar legitimate commercial need eliminating the need for contractual mutuality in the present matter.
Therefore, we find the lack of mutuality in the arbitration provision contained in the Argent agreement renders it unconscionable and unenforceable.
Scope of the Agreement to Arbitrate
Forgery of Mr. Simpson's Signature
In addition to the lack of mutuality discussed above, we question whether the parties could have considered potentially criminal actions such as forgery among the types of disputes the parties were agreeing to submit to arbitration based on the language of the agreement. We were unable to find a similar matter decided by any court within this jurisdiction. For guidance we look to outside jurisdictions for matters with similar circumstances.
We found that a factually indistinguishable case was decided by the Alabama Supreme Court. In Gregory Chrysler-Plymouth v. Barnes, 700 So.2d 1358 (Ala. 1997), a customer purchased a used vehicle from an automobile dealership. In the process of selling Mr. Barnes and his fiance their vehicle, Gregory attempted to also sell them a "Used Vehicle Extended Service Agreement" ("service agreement"), which would operate as an extended warranty on the vehicle purchased. Mr. Barnes and his fiance refused this service agreement. They purchased the vehicle and were told by Gregory representatives that they would receive copies of the executed paperwork in the mail. When they received the paperwork, they also received a fully executed service agreement, for which Mr. Barnes had been charged $1,495.00, and that appeared to contain Mr. Barnes's signature. Mr. Barnes did not dispute the authenticity of his signature on the purchase agreement, but claimed that his signature on this document was a forgery. The purchase agreement contained an arbitration agreement which provided as follows:
"Buyer and Dealer agree that all claims, demands, disputes or controversies of every kind or nature that may arise between them concerning any of the negotiations leading to the sale of the vehicle, terms and provisions of the sale, the performance or condition of the vehicle, or any other aspects of the vehicle and its sale shall be settled by binding arbitration.... Without limiting the generality *750 of the foregoing, it is the intention of the Buyer and Dealer to resolve by binding arbitration all disputes between them concerning the vehicle, the terms and meaning of any of the documents signed or given in connection with the sale of the vehicle, and any representations, promises or omissions made in connection with the financing, credit life insurance, disability insurance, and vehicle service contract purchased or obtained in connection with the vehicle. Either party may demand arbitration by filing with the American Arbitration Association a written demand for arbitration along with a statement of the matter in controversy."
Id. at 1360 (emphasis added).
In light of this arbitration agreement contained in the purchase agreement, which the plaintiffs did not dispute was validly signed and executed, Gregory argued that this fraud claim should be submitted to arbitration. Although there was also an arbitration agreement in the service agreement, as in the trading authorization form in the present matter, Gregory did not rely on the arbitration agreement within that contract in requesting that the dispute be submitted to arbitration. Rather, it relied upon the arbitration agreement contained in the purchase agreement as being inclusive of all disputes arising between the parties from that transaction. Gregory argued that the arbitration agreement was sufficiently broad to apply to Barnes's forgery claim, specifically pointing to the language emphasized in the above quote.
The Alabama Supreme Court noted that, while the arbitration agreement in the purchase agreement was broadly worded, it clearly did not compel arbitration of Mr. Barnes's claim. The court stated:
The dispute here does not concern the negotiations leading to the sale of the Hyundai, nor does it concern the terms and provisions of the sale, the performance or the condition of the Hyundai, or any other aspect of the vehicle or its sale. The dispute arises solely from Gregory's alleged forgery of Barnes's signature onto the service agreement. The fact that the arbitration provision mentions service contracts does not compel arbitration of this dispute, because Barnes says the only reason he has a service agreement is that his name was forged onto itthis alleged forgery is the heart of the fraud alleged in this case.
The United States Supreme Court has stated that "courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud ... that would provide grounds `for the revocation of any contract.'" Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 627, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985). While this is true, courts should be even more attuned to claims that the agreement from which arbitration allegedly stems was, in fact, a forged document, which would not even provide the basis from which a court could find a valid contract to be revoked; it is impossible to revoke a contract that never existed. Certainly, if the facts are as Barnes and Rogers allege, the service agreement here has never even existed as a valid contract. Although separate contractual documents may arise from a single transaction and thus be subject to an arbitration provision in a "master agreement," see Reynolds & Reynolds Co. v. King Automobiles, Inc., 689 So.2d 1 (Ala. 1996), the service agreement here cannot be subject to the purchase contract arbitration clause because its very existence is in dispute, because of the alleged *751 forgery. We further note that, contrary to Gregory's contentions, the claims made by Barnes and Rogers are entirely dissimilar to those found by this Court to be arbitrable in Ex parte Gates, 675 So.2d 371 (Ala.1996), none of which entailed the forgery of a document relied upon to help bring the dispute into arbitration.
A party cannot be required to arbitrate a dispute that he or she did not agree to arbitrate. Capital Investment Group, Inc. v. Woodson, 694 So.2d 1268 (Ala.1997). For these reasons, the trial court correctly denied Gregory's motion to arbitrate Barnes and Rogers's fraud claim. Therefore, the order of the trial court denying arbitration is affirmed.
Gregory Chrysler-Plymouth, at 1360-61
We find the language of the arbitration provision in Gregory is even more broad than the language of the arbitration provision contained in the Argent agreement signed by Mr. Simpson. The Argent agreement requires arbitration of "any transaction or construction, performance, or breach of this or any other agreement between us pertaining to securities." This list of arbitrable subject matter clearly does not cover the possible forgery of a customer's signature on additional agreements or contracts between the parties. For the reasons cited by the Alabama Supreme Court we find that claims of forgery are outside the scope of the disputes the parties agreed to submit to arbitration in the Argent agreement.
Claims in Tort
As we have found the arbitration provision contained in the May 7, 1996 agreement unenforceable for the reasons stated above, we need not address the arbitrability of the plaintiffs' claims for anxiety and worry based on the tort of conversion.
Mrs. Simpson's Cause and Right of Action
In their final argument, the plaintiffs contest whether any rights Mrs. Simpson may have to protect her community property interests are subject to the arbitration provision. In particular, Mrs. Simpson contends that the funds placed into the account are community property and that, even if the arbitration clause is found effective, it cannot be enforced against her as she did not sign the arbitration agreement. We find no merit in this argument.
We first note that the brokerage agreement, along with the arbitration clause, are contained on a document evidencing only Mr. Simpson's signature. Furthermore, the account is in his name alone. Assuming, however, that Mrs. Simpson holds property interests in the funds insofar as they may be community property, we find no merit in the argument that, even if the agreement to arbitrate is found valid, she is not bound to arbitrate her claims. Insofar as state law may affect arbitration agreements, we observe that La.Civ.Code art. 2346 provides: "Each spouse acting alone may manage, control, or dispose of community property unless otherwise provided by law." Further, La.Civ.Code art. 2360 provides: "An obligation incurred by a spouse during the existence of a community property regime for the common interest of the spouses or for the interest of the other spouse is a community obligation."[1] Mr. Simpson's agreement to arbitrate squarely fits within this provision of the Civil Code. See also Shroyer v. *752 Foster, 01-385 (La.App. 1 Cir. 3/28/02); 814 So.2d 83.
The plaintiffs cite Ciaccio v. Cazayoux, 519 So.2d 799 (La.App. 1 Cir.1987), as support for their proposition that one spouse cannot bind another to arbitration. However, we find Ciaccio, not sufficiently analogous to the present matter. In the first circuit case, Mrs. Ciaccio, pregnant with twins, visited the defendant physician due to premature labor. She had previously signed an arbitration agreement with the physician. The children died immediately after birth. Mrs. Ciaccio and her husband filed wrongful death and survival actions both individually and as parents of the deceased children. The first circuit observed that Mr. Ciaccio did not sign the agreement, nor did Mrs. Ciaccio sign the agreement as the representative of the deceased children. The court concluded, therefore, that Mr. Ciaccio and the children did not agree to submit to arbitration for the actions pursued. Certainly a survival action and one for wrongful death must be viewed differently from the type of actions arising from Mr. Simpson's attempts to "manage" or "dispose" of any community property associated with the brokerage agreement.
Pursuant to La.Civ.Code art. 2346, we find no merit in this argument.

DECREE
For the above reasons, we find the arbitration provision contained in the May 7, 1996 agreement to be unconscionable and unenforceable. We reverse the trial court's grant of the defendant's exceptions and its issuance of a stay of the proceedings, and remand the matter to the trial court for trial on the merits.
REVERSED AND REMANDED.
WOODARD, J., concurs.
AMY, J., dissents and assigns written reasons.
AMY, J., dissenting.
I conclude that an affirmation is required in this case. I differ from the majority in that I find the arbitration agreement enforceable and not a contract of adhesion. In my opinion, the appropriate starting point for resolution of this matter is consideration of the state and federal statutory provisions for arbitration clauses. As set forth in the majority opinion, La.R.S. 9:4201 provides:
§ 4201. Validity of arbitration agreements
A provision in any written contract to settle by arbitration a controversy thereafter arising out of the contract, or out of the refusal to perform the whole or any part thereof, or an agreement in writing between two or more persons to submit to arbitration any controversy existing between them at the time of the agreement to submit, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
Furthermore, Section 2 of the Federal Arbitration Act, 9 U.S.C. § 1, et seq., also provides for resolution of issues by arbitration, stating:
A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.
*753 In Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995), the United States Supreme Court reaffirmed the positive consideration afforded arbitration clauses and explained that the FAA reflected the intent of Congress to exercise its commerce power to its fullest extent. The FAA's use of the term "involving commerce" was interpreted as "affecting" commerce. Id. See also Collins v. Prudential Ins. Co. of America, 99-1423 (La. 1/19/00), 752 So.2d 825. The Supreme Court has also observed that substantive provisions of the FAA preempt state law insofar as the arbitration clause is contained in a contract involving interstate commerce. See Southland Corp. v. Keating, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984).
In the present case, it is clear that the contract entered into between the parties, a contract for securities investment, contemplates actions that "affect" commerce. Therefore, while I have considered federal guidance in reviewing the plaintiffs' assignments of error, I am also mindful that the United States Supreme Court has further instructed:
States may regulate contracts, including arbitration clauses, under general contract law principles and they may invalidate an arbitration clause "upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (emphasis added). What States may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause. The Act makes any such state policy unlawful, for that kind of policy would place arbitration clauses on an unequal "footing," directly contrary to the Act's language and Congress' intent. See Volt Information Sciences, Inc., 489 U.S., at 474, 109 S.Ct., at 1253.
Allied-Bruce, 513 U.S. at 281, 115 S.Ct. at 843. Accordingly, while considering applicable federal law, the "contract law principles" of the Louisiana Civil Code and Louisiana jurisprudence are not absent from my analysis.
La.Civ.Code art.1983 provides: "Contracts have the effect of law for the parties and may be dissolved only through the consent of the parties or on grounds provided by law. Contracts must be performed in good faith." However, as can be seen in Sutton's Steel & Supply, Inc. v. BellSouth Mobility, Inc., 00-511 (La.App. 3 Cir. 12/13/00), 776 So.2d 589, writ denied, 01-152 (La.3/16/01), 787 So.2d 316, a contract found to be adhesionary may require further examination. An adhesion contract is "a standard contract, usually in printed form, prepared by a party of superior bargaining power for adherence or rejection by the weaker party." Golz v. Children's Bureau of New Orleans, Inc., 326 So.2d 865, 869 (La.1976). See also Stadtlander v. Ryan's Family Steakhouses, 34,384 (La.App. 3 Cir. 4/4/01), 794 So.2d 881. Noting that these contracts are often in small print, the Louisiana Supreme Court explained that the issue of whether the weaker party consented to the terms is often raised. Golz, 326 So.2d 865. Similarly, the United States Supreme Court referenced the final portion of 9 U.S.C. § 2 and advised that "courts should remain attuned to well-supported claims that the agreement to arbitrate resulted from the sort of fraud or overwhelming economic power that would provide grounds `for the revocation of any contract.'" Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, 473 U.S. 614, 627, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985).
In Sutton's Steel, 00-511; 776 So.2d 589, a case advanced by the plaintiffs and discussed by the majority, a panel of this court found that an arbitration clause contained *754 in a contract between a customer and BellSouth was unenforceable. The customer's consent to the terms was found to be unclear. Setting forth the contractual provision at issue in that case, the Sutton's Steel panel found it important that the arbitration clause was on "BellSouth's standard form and [was] in exceedingly small print." Id. at p. 10; 596. The court observed that BellSouth did not demonstrate that the plaintiffs were able to negotiate the contents of the arbitration provision. Finally, the court concluded that the arbitration provision was unduly burdensome while, at the same time, providing BellSouth with the option to pursue remedies other than arbitration. In the end, the court found that "[s]uch disproportionate dispensation by BellSouth of rights and remedies is arbitrary and is lacking in good faith." Id. at p. 11; 597.
I differ from the majority in that I do not find Sutton's Steel controlling in this case. First, I find the instant matter distinguishable from the earlier panel decision. Although the arbitration clause in this case is contained on a printed form as it was in Sutton's Steel, the form is limited to a single page, printed on the front and the back. The clause is set forth in different print than the remainder of the contract and the customer signed immediately beneath a notification of the arbitration clause on the reverse of the application. Further, I do not conclude that the provisions of this arbitration clause are unduly burdensome to the plaintiffs. As can be seen from reference to the text of the clause above, it even provides that "[t]he customer may elect in the first instance whether arbitration shall be by the American Arbitration Association, or by and [sic] exchange or self regulatory organization of which TCLSI and/or Morgan Keegan is a member[.]" It is only in the event that "the customer fails to make such election, by registered letter or telegram addressed to TCLSI at, TCLSI's main address, before the expiration of ten days after receipt of a written request from AIM or Stephens to make such election, then TCLSI and/or Morgan Keegan may make such election[.]" Thus, although the parties may have contracted for resolution of issues in a different forum than the courts, the plaintiffs retained the right to initially choose their arbitrator. Finally, although the plaintiffs contend that the defendants "have reserved the right to escape any provisions of the agreement which they might find disadvantageous to them by stipulating the right to `amend this Agreement upon mailing written notice to Customer[.]'" review of the entirety of the paragraph reveals support for a finding that the contract is not one of adhesion. In its entirety, paragraph 24 of the contract provides:
This Agreement and other written forms and agreements executed by Customer collectively constitute the entire agreement between TCLSI and/or Morgan Keegan and Customer with respect to any brokerage accounts opened on Customer's behalf, except that TCLSI and/or Morgan Keegan may amend this Agreement upon mailing written notice to Customer. Either TCLSI or Morgan Keegan or Customer may terminate this Agreement any time effective upon mailing written notice to the other. If the agreement is terminated, Customer will continue to be responsible for an obligation incurred by customer prior to termination.
(Emphasis added.) Although there is no provision for the customer to amend the agreement upon written notice, the customer is not wholly without remedy as the contract provides for termination by the customer, just as it does for the defendant.
Moreover, even if Sutton's Steel did not offer a distinguishable background, I *755 would consider the persuasiveness of that case prior to its application to the present matter given the texts of the federal and legislative provisions and the guidance offered by the United States Supreme Court jurisprudence. In my opinion, the clear directive of the latter sources are dispositive of the issues at hand.
Similarly, I do not find persuasive the plaintiffs' contention that the arbitration clause should be found unconscionable. This determination is clear as both La.R.S. 9:4201 and 9 U.S.C. § 2 indicate that state and federal law provide a presumption of arbitrability. These expressions of legislative approval, along with Supreme Court jurisprudence, have unquestionably recognized a public policy in favor of enforceability of arbitration agreements.
Finally, I find no merit in the plaintiffs' arguments regarding the scope of the arbitration agreement. The plaintiffs contend that the arbitration clause cannot be applied to their claim for anxiety and worry. Specifically, they point out that their petition alleges not only contractual theories of recovery, but that a theory of recovery due to conversion is also advanced. Because of the tortious nature of this claim, and the inability to contract for the right to engage in illegal activity, they contend that they should be able to pursue recovery for general damages.
Although the defendants argue that general damages are not recoverable in this type of case as there is no physical injury, jurisprudence indicates the availability of general damages in conversion cases. See Quealy v. Paine, Webber, Jackson & Curtis, Inc., 475 So.2d 756 (La.1985); Broussard, Bolton, Halcomb & Vizzier v. Williams, 01-219 (La.App. 3 Cir. 10/3/01), 796 So.2d 791; Labbe v. Premier Bank, 618 So.2d 45 (La.App. 3 Cir.1993). Examination of the arbitration clause indicates that any claim for general damages, insofar as the plaintiffs may be found to be entitled to them, are not excluded from the arbitration clause. The clause provides that the parties "agree that all controversies which may arise between the parties concerning any transaction or construction, performance, or breach of this or any other agreement between us pertaining to securities and other property, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration...." The face of the provision is sufficiently broad to be interpreted to pertain to a number of causes of action. While the United States Supreme Court has explained that the proarbitration policy of the FAA does not operate without consideration of the desires of the parties, "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 62, 115 S.Ct. 1212, 1218, 131 L.Ed.2d 76 (1995), quoting, Volt Information Sciences, Inc. v. Board of Trustees, 489 U.S. 468, 476, 109 S.Ct. 1248, 1254, 103 L.Ed.2d 488 (1989).
After consideration of the language at issue in this case, I do not find that the contract entered into by the parties provides for any potential claims to be decided outside of arbitration. Insofar as the language is ambiguous, I conclude that it must be resolved in favor of arbitration.
For the above reasons, I respectfully dissent.
NOTES
[1] Although enacted after the creation of the agreement at issue, for reference purposes, we also point to La.Civ.Code art. 2985, which provides: "A person may represent another person in legal relations as provided by law or by juridical act. This is called representation."