United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 21, 2004**

Charles R. Fulbruge III
Clerk

REVISED AUGUST 16, 2004

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-30613

_____

IBERIA CREDIT BUREAU INC, Etc; ET AL

Plaintiffs

IBERIA CREDIT BUREAU INC, doing business as Information
Services; WARDELL X GERHARDT; CONSTANCE WHITE LOUVIERE;
CHARLES V LANDRY; SID HEBERT, on behalf of Iberia Parish
Sheriff's Department

Plaintiffs - Appellees

v.

CINGULAR WIRELESS LLC, Etc; ET AL

Defendants

CINGULAR WIRELESS LLC, formerly known as BellSouth Mobility,
also known as Cingular/Bellsouth; SPRINT SPECTRUM COMPANY
LP; CENTENNIAL BEAUREGARD CELLULAR LLC, formerly known as
Iberia Cellular Telephone Company LLC, doing business as
Centennial Wireless

Defendants - Appellants

_____

Appeals from the United States District Court
for the Western District of Louisiana
_____

Before KING, Chief Judge, and REAVLEY and EMILIO M. GARZA,
Circuit Judges.

KING, Chief Judge:

The appellees in this action are customers of three cellular-telephone service providers, Cingular Wireless LLC, Sprint Spectrum LP, and Centennial Beauregard Cellular LLC. The customers alleged that the service providers engaged in deceptive trade practices and breached the customers' service agreements. The companies moved to compel arbitration of the dispute under the Federal Arbitration Act and written arbitration clauses in the customers' service agreements. The district court denied the motions to compel arbitration, and the companies brought this interlocutory appeal. We conclude that the district court correctly denied Centennial's motion but erred in denying Cingular's and Sprint's motions. We therefore affirm in part, reverse in part, and remand.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In September 2001, a group of cellular-telephone customers filed suit in Louisiana state court against their respective service providers--Cingular, Sprint, Centennial, and Telecorp Communications, Inc.[1]--and the providers' local agents. The suit, which alleged causes of action for breach of contract and violation of the Louisiana Unfair Trade Practices Act, LA. REV. STAT. ANN. § 51:1401 et seq. (West 2003), was predicated on certain allegedly deceptive billing procedures, most notably the providers' practice of rounding up calls to the next whole minute

---

[1] The fourth defendant, Telecorp, is not involved in this appeal.

2

for billing purposes. The defendants removed the case to federal court on the basis of diversity of citizenship. The district court denied a motion to remand and dismissed the local agents on the ground that they had been fraudulently joined to destroy complete diversity. The case is a putative class action, but no class has yet been certified.

Some of the various plaintiffs' contracts with their respective service providers include arbitration provisions, but other contracts do not, depending on the plaintiff and the date of the contract. The plaintiffs' original complaint and the first two amended complaints stated that the plaintiffs were <u>not</u> pursuing claims related to contracts that contain arbitration clauses. A later version of the complaint dropped that limitation. When the plaintiffs began to pursue claims that involved contracts containing arbitration clauses, Cingular, Sprint, and Centennial filed motions to compel arbitration and to stay the judicial proceedings as regards the plaintiffs who were their respective customers. The state attorney general has also intervened in the case as a plaintiff. The defendants did not attempt to compel arbitration with regard to any contracts with the state, however, and the state is not involved in this appeal.

The arbitration clauses in the various contracts differ in some relevant respects, as set forth more fully below.

A.    **Centennial plaintiff**

Plaintiff Sid Hebert, Sheriff of Iberia Parish, is suing as a representative of the Iberia Parish Sheriff's Department. Through one of the Department's deputies, Walter Dodge, who acts as its purchasing agent, the Department opened a multi-telephone account with Centennial in 1999. Extra phones were added to the account during the next couple of years. These agreements did not contain arbitration clauses.

On October 24, 2002, thirteen months after the original complaint in this case had been filed (but several months before the Sheriff's Department was added as a plaintiff in the case), the Department added still another phone to its Centennial account, with Dodge signing another standard-form service agreement. This latest form stated, above the signature line: "I acknowledge I have read and understand the terms and conditions on the back of this order form and agree to those terms." The final paragraph on the back of the form contains an arbitration clause requiring the customer (but perhaps not the company--a matter of dispute) to arbitrate all claims.[2] The clause provides that the arbitrator may not order consolidation or class arbitration. It further states that any arbitration would be confidential, and it includes a severability clause stating that if any portion of the arbitration clause is deemed invalid, the

_____

[2] The disputed portion of the arbitration clause is set forth at length in conjunction with our legal analysis, in Part III.B.1.

4

rest would remain in force.  Dodge and the Sheriff state that they did not negotiate the terms and were not told of the arbitration clause, which had not been a part of the parties' previous agreements.

Another section of the Centennial Terms and Conditions states that Centennial can change the contract terms by sending written notice to the customer.

**B.    Cingular plaintiffs**

Plaintiffs Iberia Credit Bureau, Inc., Constance Louviere, and Wardell Gerhardt entered into service agreements with Cingular.  The agreements are standard forms consisting of a number of blank boxes for filling in various customer and service details, followed by six paragraphs of text.  The third paragraph of each agreement explicitly incorporates by reference Cingular's Terms and Conditions.  Each plaintiff signed the form. Immediately above the signature line was the following statement:

> I ACKNOWLEDGE THAT I HAVE READ AND UNDERSTAND THIS AGREEMENT AND THE TERMS AND CONDITIONS, AND THE PLAN PROVISIONS AND CONDITIONS.  I AGREE TO BE BOUND THEREBY.

The Terms and Conditions were (depending on which plaintiff is involved) either printed on the back of the form or presented in a separate pamphlet that accompanied the form.  The two versions of the Terms and Conditions are substantially identical.

The section of the Terms and Conditions concerning arbitration provides that "instead of suing in court, CINGULAR

and you agree to arbitrate any and all disputes and claims (including but not limited to claims based on or arising from an alleged tort) arising out of or relating to this Agreement." The Terms and Conditions further provide, among other things, that the parties "agree that no arbitrator has the authority to . . . order consolidation or class arbitration" and that neither party "may disclose the existence, content, or results of any arbitration."[3]  The arbitration provision concludes by stating that "[n]otwithstanding the foregoing, either party may bring an action in small claims court."

Another section of the Terms and Conditions permits Cingular to change any terms, conditions, rates, or fees at any time.  A customer who has signed a term contract, such as a one-year commitment, may cancel service in response to such a change without incurring a termination fee.  Finally, the Terms and Conditions include a severability clause providing that the unenforceability of one provision of the agreement does not affect the remaining terms.

## C.  Sprint plaintiff

Plaintiff Charles Landry, the only plaintiff in this appeal who is suing Sprint, has two Sprint cellular accounts.  The first one, opened in July 2001, does not contain an arbitration clause,

---

[3]     Cingular's arbitration clause, like the others involved in this case, also contains provisions regarding matters such as responsibility for the costs of arbitration proceedings, but those provisions are not at issue in this appeal.

but the second account, opened in August 2002, does.  This second account was opened after the initial complaint in the lawsuit was filed.  Sprint's request for arbitration concerns only claims arising from the second account.

Sprint includes its Terms and Conditions in the box with the handset that the customer purchases.  The Terms and Conditions do not call for a signature, but they provide that the customer accepts them by activating his account.  The version of the Terms and Conditions included with Landry's phone contained the following provision:

> ARBITRATION OF DISPUTES.  ANY CLAIM, CONTROVERSY OR DISPUTE, WHETHER SOUNDING IN CONTRACT, STATUTE, OR TORT, INCLUDING FRAUD, MISREPRESENTATION, OR ANY OTHER LEGAL THEORY, RELATED DIRECTLY OR INDIRECTLY TO THE [Sprint services], WHETHER BETWEEN THE COMPANY AND THE CUSTOMER OR BETWEEN THE COMPANY OR THE CUSTOMER, ON THE ONE HAND, AND EMPLOYEES, AGENTS OR AFFILIATED BUSINESSES OF THE OTHER PARTY, ON THE OTHER HAND, SHALL BE RESOLVED BY ARBITRATION AS PRESCRIBED IN THIS SECTION.[4]

This section of the Terms and Conditions further provides that no discovery will be permitted in the arbitration, except that the parties will exchange, before the hearing, the evidentiary materials that they plan to submit to the arbitrator.[5]

---

[4]     A new version of the arbitration clause appears in the Terms and Conditions that became effective August 1, 2002.  The parties agree that this later version, which was the version that was in effect when Landry actually activated his phone, is relevantly equivalent.

[5]     The arbitration provision is several paragraphs long, but the portion concerning discovery provides as follows:

No discovery will be permitted, except that the parties

7

Other parts of the Sprint Terms and Conditions set forth additional provisions relevant to this appeal. Like Centennial and Cingular, Sprint reserves the right to change the parties' agreement at any time by publishing new Terms and Conditions. If the customer uses the Sprint services or pays a bill after the effective date of the change, he is deemed to have accepted the change. The Sprint Terms and Conditions also include a severability clause stating that if any provision in the contract is deemed invalid, the remaining terms remain in force.

**D.    The district court's decision**

The district court heard argument on the motions to compel arbitration on May 23, 2003, and denied the motions with oral reasons. The judge expressed his view that, based on the circumstances of contract formation, the plaintiffs had not really assented to the arbitration clauses. Moreover, he concluded that the agreements "simply put[] all the benefit to the company and none to the consumer" and were thus unconscionable under Louisiana law. The court was apparently of the view that all of the agreements bound only the customer, but not the company, to pursue arbitration; this was one of the major factors behind the court's unconscionability holding, though the

will exchange, thirty days prior to the hearing on their dispute, all documents to be submitted to the arbitrator, including any reports or summaries, and a list of the names and addresses of those persons to be called to testify. Following exchange of this information, the parties may agree to waive a hearing.

8

court also found other features of the contracts worryingly harsh.

The court formalized the ruling with a written order dated May 27. Centennial, Cingular, and Sprint timely appealed, asserting appellate jurisdiction under 9 U.S.C. § 16.

## II. APPELLATE JURISDICTION

We have appellate jurisdiction over this interlocutory appeal by virtue of 9 U.S.C. § 16(a)(1), which permits immediate appeals of district court orders denying requests to compel arbitration and to stay litigation. See Am. Heritage Life Ins. Co. v. Lang, 321 F.3d 533, 536 (5th Cir. 2003).

Despite the apparent statutory basis for our jurisdiction, the plaintiffs have filed a motion to dismiss the appeal. Citing Cerveceria Cuauhtemoc Moctezuma S.A. v. Montana Beverage Co., 330 F.3d 284 (5th Cir. 2003) (per curiam), they argue that we lack jurisdiction whenever the district court determines that the parties did not form a binding agreement to arbitrate. (The district court's decision in this case, as described above, was based on both unconscionability and a failure of mutual assent.) A recent decision of this court squarely addressed and rejected the precise argument that the plaintiffs raise here. See May v. Higbee Co., 372 F.3d 757 (5th Cir. 2004). Section 16(a)(1) confers jurisdiction over this appeal notwithstanding the district court's opinion that the documents at issue in this case

9

failed to constitute a binding agreement to arbitrate. Accordingly, we will deny the plaintiffs' motion to dismiss the appeal and proceed instead to the merits of the district court's decision.

### III. ANALYSIS

The parties' dispute has become relatively narrow. The plaintiffs do not deny that the scope of the arbitration clauses is broad enough to encompass their causes of action. Nor do they contend in their appellate brief, though they did at times below, that they never assented to the arbitration clauses. They do contend, however, that the arbitration clauses at issue in this case are unconscionable and unenforceable.[6] The district court agreed with them and refused to compel arbitration. We review the denial of the motion to compel arbitration de novo. Carter v. Countrywide Credit Indus., Inc., 362 F.3d 294, 297 (5th Cir. 2004).

---

[6] With one exception that we will note later, see infra note 16, the parties on both sides of the case, both in the district court and here, have treated the question of the possible unconscionability of the arbitration clause as a matter to be decided by the court rather than by the arbitrator. Cf. Banc One Acceptance Corp. v. Hill, 367 F.3d 426, 429-31 (5th Cir. 2004) (concluding that a procedural unconscionability attack on an arbitration clause was a question for the court); Inv. Partners, L.P. v. Glamour Shots Licensing, Inc., 298 F.3d 314, 316 (5th Cir. 2002) (holding that the court should decide an attempt to void an arbitration clause as violative of public policy). But cf. Anders v. Hometown Mortgage Servs., Inc., 346 F.3d 1024, 1031 (11th Cir. 2003) (holding that where an arbitration clause's limitations on remedies were severable, a challenge to them was for the arbitrator to decide). We will therefore proceed on the same basis.

## A.    Applicability of state unconscionability principles

The argument that an arbitration agreement or clause is unconscionable or otherwise unenforceable requires consideration of both federal and state law.  The Federal Arbitration Act (FAA) was in large part motivated by the goal of eliminating the courts' historic hostility to arbitration agreements.  Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 270-71 (1995).  Section 2 of the FAA puts arbitration agreements on the same footing as other contracts:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2 (emphasis added).  That is, as a matter of federal law, arbitration agreements and clauses are to be enforced unless they are invalid under principles of state law that govern all contracts.  Therefore, "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements without contravening § 2." Doctor's Assocs. v. Casarotto, 517 U.S. 681, 687 (1996) (emphasis added).[7]  But a state court or legislature may not invalidate

---

[7]    Alone among the defendants, Sprint makes an argument (in a single paragraph in its brief) that, notwithstanding the role for state law that 9 U.S.C. § 2 expressly permits, the Federal Communications Act preempts any state-law rules that would lead to the invalidation of its arbitration agreement.

11

arbitration agreements on the basis of a rule of law that applies only to such agreements, such as by declaring them invalid unless they contain a special notice on the front page. Id.

In the case at bar, the district court invalidated the defendants' various arbitration clauses based on general contract principles of unconscionability. In doing so, the court relied heavily on a recent Louisiana case, Sutton's Steel & Supply, Inc. v. BellSouth Mobility, Inc., 776 So. 2d 589 (La. App. 3 Cir. 2000), that ruled that an arbitration clause very much like one of the clauses at issue in this case (namely, Centennial's) was invalid under Louisiana law. Another recent Louisiana case, also relied upon heavily by the plaintiffs in this appeal, held that an arbitration clause somewhat similar to all of the clauses at issue here was likewise unconscionable and unenforceable under state law. See Simpson v. Grimes, 849 So. 2d 740 (La. App. 3 Cir.), writ denied, 861 So. 2d 567 (La. 2003).

---

Compare Boomer v. AT&T, 309 F.3d 404, 417-23 (7th Cir. 2002) (adopting such a theory), with Ting v. AT&T, 319 F.3d 1126, 1135-47 (9th Cir.) (rejecting it), cert. denied, 124 S. Ct. 53 (2003). Sprint's fleeting reference to this argument in its motion to compel arbitration failed to present this complex issue in a sufficient manner to give the district court a reasonable opportunity to rule on it, FDIC v. Mijalis, 15 F.3d 1314, 1327 (5th Cir. 1994), especially considering that Sprint did not mention the issue during the lengthy hearing at which the district court made its decision. See Louque v. Allstate Ins. Co., 314 F.3d 776, 780 n.1 (5th Cir. 2002) ("As a general rule, a party may not allude to an issue in the district court, abandon it at the crucial time when the district court might have been called to rule upon it, and then resurrect the issue on appeal."). In any event, we determine that Sprint's agreement survives the application of Louisiana unconscionability rules.

12

The parties sharply disagree about the import of these Louisiana cases. For the plaintiffs, they are practically determinative inasmuch as they show that agreements relevantly equivalent to those at issue in this case are invalid under general Louisiana rules of unconscionability. But the defendants respond that these cases are both incorrect as a matter of state law and inconsistent with federal law in that they single out arbitration clauses for especially searching review.

That a state decision employs a general principle of contract law, such as unconscionability, is not always sufficient to ensure that the state-law rule is valid under the FAA. Even when using doctrines of general applicability, state courts are not permitted to employ those general doctrines in ways that subject arbitration clauses to special scrutiny. As the Supreme Court has cautioned:

> A court may not . . . in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law. Nor may a court rely on the uniqueness of an agreement to arbitrate as a basis for a state-law holding that enforcement would be unconscionable, for this would enable the court to effect what we hold today the state legislature cannot.

Perry v. Thomas, 482 U.S. 483, 493 n.9 (1987); see also Banc One, 367 F.3d at 432 (explaining that "state courts may properly strike down arbitration clauses, but they may not treat arbitration clauses differently than other contract terms").

13

State judges, no less than federal judges, are sworn to uphold supreme federal law.  U.S. CONST. art. VI.  Indeed, we ordinarily presume that state courts are aware of and faithfully follow federal law, including of course the FAA.  Cf. Allen v. McCurry, 449 U.S. 90, 105 (1980).  Our own duty to follow federal law does, however, mean that we must exercise a degree of care when applying state decisions that strike down arbitration clauses as unconscionable.  Such scrutiny of state decisions is unusual in our comity-driven federal system, but it is our duty under the FAA.

Having set forth the role of state contract law in invalidating arbitration clauses, we turn now to the substance of the relevant Louisiana law.  No section of the Louisiana Civil Code directly addresses, in so many words, the doctrine of unconscionability or the related concept of adhesionary contracts.  Nonetheless, Louisiana jurisprudence does recognize that certain contractual terms, especially when contained in dense standard forms that are not negotiated, can be too harsh to justly enforce.  The theory of such decisions, often, is that an unconscionable contract or term can be thought of as lacking the free consent that the Code requires of all contracts.  See generally Ronald L. Hersbergen, Unconscionability: The Approach of the Louisiana Civil Code, 43 LA. L. REV. 1315 (1983).[8]  In

---

[8]     The civil law concept of lesion--which concerns the relative value of the performance agreed to be received and the

14

order to be invalidated, a provision must possess features of both adhesionary formation and unduly harsh substance.  See <u>Andry v. New Orleans Saints</u>, 820 So. 2d 602, 603-04 (La. App. 5 Cir. 2002) ("[A]dhesion contracts are not <u>per se</u> unenforceable, but rather lend themselves to an inquiry as to whether the weaker party consented to the fine print, and if so whether the adhesionary clause is unduly burdensome or extremely harsh."); Saúl Litvinoff, <u>Consent Revisited: Offer Acceptance Option Right of First Refusal and Contracts of Adhesion in the Revision of the Louisiana Law of Obligations</u>, 47 La. L. Rev. 699, 758 (1987) ("[W]here a party had no power to negotiate a contract, [the Louisiana courts] may disregard a particular clause in the contract when that clause is unduly burdensome or extremely harsh.").

## B.    Application of the principles to the arbitration agreements

The arbitration clauses at issue in this case share several features in common and to that extent lend themselves to a common analysis.  But each is also distinctive in certain ways.  The agreement drafted by one of the defendants, Centennial, possesses a significant feature that the others lack.  Namely, among its other challenged features, the agreement appears to require only

---

performance agreed to be rendered--can serve a similar role in policing bargains, though only with regard to certain types of transactions.  <u>See</u> <u>generally</u> Saúl Litvinoff, <u>Vices of Consent, Error, Fraud, Duress and an Epilogue on Lesion</u>, 50 La. L. Rev. 1, 107-15 (1989).

15

the customer to arbitrate all disputes, leaving the company with the choice of pursuing a lawsuit instead of arbitrating. Louisiana cases suggest that this is a particularly troubling provision, and so we discuss Centennial's arbitration clause separately from the other defendants' agreements.

1.  Centennial

Centennial denies the charge that its arbitration clause is one-sided, arguing that its arbitration provision equally binds both parties to arbitrate disputes.  The arbitration clause provides as follows:

> *Dispute Resolution; Waiver of Trial by Jury; Waiver of Class Actions* - Please read this section carefully.  It affects rights that you may otherwise have.  It provides for resolution of <u>most disputes</u> through arbitration instead of court trials and class actions. . . . <u>You agree that instead of suing in court, you will arbitrate any and all disputes and claims arising out of this Agreement or the Service</u>.  Even if applicable law provides otherwise, <u>you and we each waive</u> our right to a trial by jury and to participate in class actions. . . . By this agreement, <u>both you and we</u> are waiving <u>certain rights</u> to litigate disputes in court.  If for any reason this arbitration clause is deemed inapplicable or invalid, <u>you and we both waive</u>, to the fullest extent allowed by law, any claims to recover punitive or exemplary damages and any right to pursue any claims on a class or consolidated basis or in a representative capacity.

(emphasis added).  Read carefully, the language is quite precise. While most of the statements in this paragraph refer to "you and we" waiving certain rights, the critical sentence in the middle that sets forth the duty to arbitrate says only that "you agree" that "you will arbitrate" rather than sue in court.  Centennial's

16

brief repeatedly asserts that both parties are required to arbitrate, but it never really explains this key sentence, the plain meaning of which binds only the customer.  The conclusion that only the customer, but not Centennial, is required to arbitrate is further bolstered (if such bolstering were needed) by the sentence stating that "most disputes" between the parties will be resolved through arbitration.  If both parties were required to arbitrate "any and all disputes," as Centennial claims, then one would wonder why the contract says that only "most disputes," not all disputes, are subject to resolution through arbitration.[9]  Centennial's answer is that the language was drafted using the qualifier "most" in order to take into account the possibility that a customer could, for example, bring a tort suit after randomly being hit by one of the companies' vans on the street.  Such a suit, according to Centennial, would not be covered by the duty to arbitrate because it does not "aris[e] out of this Agreement or the Service"; thus the use of "most."  We find it quite improbable that the language was drafted with such a scenario in mind and, in any event, the

---

[9]    The arbitration clause contains another sentence that states that "[t]he arbitration of any dispute or claim shall be conducted in accordance with" certain American Arbitration Association rules.  We do not read this as stating that both parties must arbitrate all disputes but rather as a statement that any arbitration that does occur must be governed by the specified AAA rules.

17

proffered explanation is insufficient to overcome the clear import of the critical sentence in the agreement.

The one-sidedness of the duty to arbitrate raises a serious question as to the clause's validity. Recent Louisiana appellate cases have deemed such an arrangement unconscionable and unenforceable. One of those cases, Sutton's Steel v. BellSouth Mobility, is on all fours with the present case. Sutton's Steel involved a standard-form cellular-phone contract that generally required disputes to be arbitrated but expressly carved out an exception for attempts to collect debts from the customer, which actions BellSouth could pursue in the courts. 776 So. 2d at 594-96. Like Centennial's arbitration clause, the clause in Sutton's Steel also barred the arbitrator from ordering consolidation or class arbitration. Id. The court recognized that arbitration is favored in the law and cited Louisiana's cognate to 9 U.S.C. § 2. Id. at 596. It nonetheless refused to enforce the clause. The court observed that the clause was printed in small type on a standard form and had not been bargained over. Id. The court further determined that "the substance of the arbitration provision is unduly burdensome and extremely harsh." Id. The court found particular fault with the one-sidedness of the duty to arbitrate. Id. at 596-97.[10] The court concluded that "[s]uch

_____

[10] Although subsequent cases state that the "lack of mutuality" in the Sutton's Steel arbitration agreement was of particular concern, see Simpson, 849 So. 2d at 747-48, both Sutton's Steel and Simpson make clear that the lack of a

18

disproportionate dispensation . . . of rights and remedies is arbitrary and is lacking in good faith," and it refused to enforce the clause.  Id. at 597.  Likewise, in another recent case, a different Louisiana appellate court invalidated a one-sided arbitration clause in a consumer form contract because it was written in small print and was "unduly burdensome" to the consumer.  See Posadas v. The Pool Depot, Inc., 858 So. 2d 611, 614 (La. App. 1 Cir.), writ denied, 857 So. 2d 502 (La. 2003).[11]

reciprocal duty to arbitrate rendered the arbitration clause unconscionable and unenforceable because it was an adhesionary provision that was "unduly burdensome" to the consumer. See id. at 746-47; Sutton's Steel, 776 So. 2d at 596-97.  Thus, the court's decision in Sutton's Steel was based on adhesion and unconscionability, with the one-sidedness of the duty to arbitrate acting as the primary indicator of unfairness.  The court's decision was not based on the distinct doctrine of mutuality of remedy, according to which (it is said) courts will not order an equitable remedy such as specific performance unless it is available to both parties.  See generally 3 RICHARD A. LORD, WILLISTON ON CONTRACTS § 7:14 (4th ed. 1992); J.E. Macy, Annotation, Comment Note--Mutuality of Remedy as Essential to Granting of Specific Performance, 22 A.L.R.2d 508 (1952).

[11]    While the Louisiana Supreme Court has not addressed the enforceability of such a provision, "a decision by an intermediate appellate state court 'is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.'"  Tex. Dep't of Hous. & Cmty. Affairs v. Verex Assurance, Inc., 68 F.3d 922, 928 (5th Cir. 1995) (quoting West v. Am. Tel. & Tel. Co., 311 U.S. 223, 237 (1940)).  Here, of course, we have two such data points.  We are aware that courts in other jurisdictions have reached varying decisions when faced with unconscionability challenges to one-sided arbitration clauses.  See, e.g., Ingle v. Circuit City Stores, Inc., 328 F.3d 1165, 1174-75 (9th Cir. 2003) (holding such an agreement unconscionable per se), cert. denied, 124 S. Ct. 1169 (2004); Harris v. Green Tree Fin. Corp., 183 F.3d 173, 183-84 (3d Cir. 1999) (enforcing such a clause); Ex parte Parker, 730 So. 2d 168, 171 (Ala. 1999) (stating that lack of a bilateral

As explained earlier, federal law would not give effect to these state court holdings if they single out arbitration clauses for especially strict scrutiny. We cannot conclude, at this time, that the controlling state decisions apply different rules than other Louisiana cases or that they apply the usual rules differently. They certainly purport to apply general rules of Louisiana contract law. The Sutton's Steel opinion bases its understanding of adhesion contracts and unconscionability on generally applicable codal provisions and learned commentary, 776 So. 2d at 593-94, not sources applicable specifically to arbitration. Posadas cites § 2 of the FAA, which states that arbitration clauses are valid except when they are invalid under generally applicable rules of contract law, and Sutton's Steel cites a nearly identical provision of state law; thus both cases recognize the favored status of arbitration. The cases do not necessarily express the impermissible view that arbitration is inferior to litigation, for a choice of remedies is better than being limited to one forum. Cf. Sutton's Steel, 776 So. 2d at 596 (stating that BellSouth attempts to bind customers to arbitration but "reserves unto itself the option of pursuing other remedies" (emphasis added)); id. at 597 (referring to BellSouth's "disproportionate dispensation . . . of rights and remedies"). In sum, while we underscore again that federal

_____

duty to arbitrate can be "one factor" in the unconscionability analysis but is not determinative).

20

courts must exercise care in enforcing state doctrines of unconscionability to invalidate arbitration clauses, we conclude in this case that the controlling state cases can properly be applied under 9 U.S.C. § 2, which permits invalidation of arbitration agreements under generally applicable rules of state law. Our decision in this regard accords with this court's recent decision in Banc One, 367 F.3d at 431-32, which applied an on-point Mississippi unconscionability holding where the state decision did not appear to discriminate against arbitration.[12]

Despite the evident similarities between Sutton's Steel and the present case, Centennial attempts to distinguish Sutton's Steel on the grounds that the parties bargained over the contract at issue here. When a contract is bargained over, Centennial says, the substantive harshness of any term is irrelevant under Louisiana law. According to Centennial's brief, the Sheriff's Department's "sophisticated purchasing agent" negotiated a special arrangement whereby many phones shared the same block of airtime.[13] The record generated in the district court, however,

_____

[12] As Banc One also explained, later developments could show that the apparently evenhanded state holdings are in fact applicable only to arbitration agreements. 367 F.3d at 432 n.3. But as in Banc One, we are unable to so conclude at this point.

[13] Centennial also argues that its clause must be enforced because the customer could choose to take his business to another cellular service provider who, perhaps, would not have an arbitration clause. But the same was true in Sutton's Steel, and Simpson v. Grimes expressly rejects such an argument. See Simpson, 849 So. 2d at 746-48; cf. Simpson v. Pep Boys-Manny Moe & Jack, Inc., 847 So. 2d 617, 622 (La. App. 4 Cir. 2003)

21

does not support Centennial's efforts to paint this as a negotiated contract.  So far as the record suggests, the purchasing agent, Deputy Dodge, was simply a member of the department.  Importantly, Sheriff Hebert and Deputy Dodge both state in affidavits, filed as attachments to their opposition to the motion to compel arbitration, that they "did not negotiate nor . . . have the opportunity to negotiate the terms of" the service agreements; both likewise say that they simply agreed to purchase "a set number of minutes for a set monthly price." Centennial did not controvert these affidavits or argue, during the hearing on the motion, that the contracts were negotiated.

The sole evidentiary basis for Centennial's argument on appeal is the contracts themselves.  The documents reflect that tens of phones were part of the same account and that more phones were added periodically, but beyond that they are rather unilluminating standing alone.  All of these transactions, including the October 2002 transaction that first added the arbitration clause, were accomplished on Centennial's standard service-agreement forms.  There is certainly no indication that Dodge had any opportunity to quarrel with the boilerplate terms and conditions printed on the back of the forms; his affidavit in fact states that he could not and did not negotiate anything.

_____

(recognizing the availability of other options as one factor in the analysis but also observing that the challenged contract was not in fine print and was not unduly burdensome).

Assuming that Centennial did not forfeit this issue by failing to press it below, we reject Centennial's attempt to bring its case outside of Sutton's Steel.

Before closing our discussion of the Centennial agreement, we observe that the contract contains a severability clause, which provides that "[i]f any portion of this arbitration agreement is determined by a court to be inapplicable or invalid, the remainder shall still be given full force and effect." While the clause might come into play if (for example) we deemed Centennial's confidentiality rule invalid, it cannot cure the one-sidedness of the duty to arbitrate. This case does not present a situation in which a certain offensive term can be stricken from an otherwise valid agreement to arbitrate, which is what a severability clause permits the court to do. See SWAT 24 Shreveport Bossier, Inc. v. Bond, 808 So. 2d 294, 308-09 (La. 2001). On the contrary, the offensive provision here is the sentence in which the customer, but not Centennial, is required to arbitrate. Saving the clause would require not that we excise an invalid excrescence and then send the pared-down contract to arbitration but that we redraft the contract to add important new material--a duty on Centennial's part to arbitrate. The severability clause therefore cannot accomplish the needed repair. Cf. Armendariz v. Found. Health Psychcare Servs., Inc., 6 P.3d 669, 697-99 (Cal. 2000) (concluding that a severance could not save such an arbitration agreement).

In conclusion, we hold that the district court did not err in denying Centennial's motion to compel arbitration.

2. <u>Cingular and Sprint</u>

We next turn to Cingular and Sprint. We discuss the Cingular and Sprint agreements in tandem, since some of the same considerations are applicable to both. Although we examine each challenged feature of the arbitration clauses one at a time, we are mindful (as the plaintiffs urge us to be) that we must consider the combined effect of the various aspects of the clauses.

a. <u>Fine print (Cingular and Sprint)</u>

The plaintiffs complain that the arbitration clauses are in difficult-to-read fine print. The district court so remarked at the hearing on the motions to compel arbitration. Type size would seem to bear most directly on the question whether the contracts were formed in an adhesionary manner, which then triggers a review for substantive harshness. <u>See</u> <u>Andry</u>, 820 So. 2d at 603-04. But the plaintiffs' type-size argument does not by itself show that the arbitration clause is invalid. The companies' arbitration clauses are not printed in type that is smaller than that generally used in the rest of the contract.[14]

---

[14] Indeed, parts of the arbitration clause in the Sprint contract are printed in type that is somewhat larger than the type that is generally employed. Similarly, the first paragraph of the Cingular contract specifically adverts to the arbitration clause, the only provision given such prominent billing.

24

See Reimoneng v. Foti, 72 F.3d 472, 477 (5th Cir. 1996). The FAA prohibits states from passing statutes that require arbitration clauses to be displayed with special prominence, Casarotto, 517 U.S. at 686-88, and courts cannot use unconscionability doctrines to achieve the same result, Perry v. Thomas, 482 U.S. at 492 n.9. We therefore reject the type-size argument as a basis for invalidating the arbitration clauses.

   b.   Change-in-terms clause (Cingular and Sprint)

All of the contracts at issue in this case include a clause permitting the cellular service provider to change the terms of the agreement. The plaintiffs argue that these clauses render the agreement illusory[15] or render the arbitration clause unconscionable, or both.[16]

---

[15]   The doctrine of illusory promises is familiar within the common law. See generally RESTATEMENT (SECOND) OF CONTRACTS § 77 cmt. a (1981); WILLISTON ON CONTRACTS, supra, § 7:7. The Louisiana civil-law tradition recognizes some of the same basic principles that lie behind the common-law doctrine, albeit by employing different terminology. See 5 SAÚL LITVINOFF, LOUISIANA CIVIL LAW TREATISE: THE LAW OF OBLIGATIONS § 5.6 (2d ed. 2001).

[16]   Although the defendants do not dwell on this point (only Cingular mentions it, and only in a footnote), we note that the change-in-terms clause potentially implicates the so-called separability doctrine, which requires certain challenges to contracts containing arbitration clauses to be heard by the arbitrator rather than by the court. See Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395 (1967) (holding that a fraudulent-inducement defense that applied to the contract as a whole, as opposed to the arbitration clause in particular, was for the arbitrators to consider in the first instance). No other defendant takes such a position, however, and so we will consider the plaintiffs' challenge to the clause on its merits. Moreover, here the plaintiffs link the change-in-terms clause specifically to the arbitration clause in that they claim that the former

There is some support in Louisiana law for the plaintiffs' position.  A Louisiana appellate court recently concluded that a change-in-terms provision in a standard-form contract between a securities brokerage firm and its customers rendered the contract's arbitration clause one-sided and therefore unconscionable.  See Simpson, 849 So. 2d at 746-49.  Unlike the contract in Sutton's Steel, which we discussed earlier, the terms of the arbitration clause in Simpson facially bound both parties to arbitrate their disputes.  But the contract in Simpson also contained another paragraph stating that the brokerage "may amend this Agreement upon written mailing [sic] notice to Customer."  According to the Simpson court, this change-in-terms clause allowed the brokerage to achieve "through clever subterfuge" the forbidden one-sided arbitration clause condemned in Sutton's Steel.  Id. at 748.  The court accordingly deemed the arbitration clause unconscionable and unenforceable.  Id. at 749.

The defendants vigorously oppugn Simpson, both as a statement of Louisiana law and as a matter of § 2 of the FAA, under which a court may invalidate an arbitration clause only on grounds that would invalidate any contract.  They aptly point out that the economy is saturated with contracts that contain change-in-terms provisions of the sort involved here.  The party with

could at any time be used to render the duty to arbitrate one-sided--making it unconscionable under Sutton's Steel.  As discussed in the text, one Louisiana court has adopted precisely that reasoning in striking down an arbitration clause.

26

the power to change the terms could, in theory, change any term in the contract in a way that would make the contract unconscionable. (The cell phone company could, for example, surreptitiously raise the monthly fee to thousands of dollars and give itself a security interest in the customer's house, all in easy-to-miss fine print.) But while we are not lightly to disregard the rulings of state intermediate appellate courts, we do not agree that the Louisiana Supreme Court would use Simpson's reasoning to declare unenforceable every contract with a change-in-terms clause. In fact, other Louisiana cases have enforced contracts, including arbitration contracts, that contain such provisions. See Stadtlander v. Ryan's Family Steakhouses, Inc., 794 So. 2d 881 (La. App. 2 Cir. 2001) (arbitration agreement with change-in-terms provision); cf. Seals v. Calcasieu Parish Voluntary Council on Aging, Inc., 758 So. 2d 286, 291-93 (La. App. 3 Cir. 2000) (explaining that an employment contract that gave the employee a right to cancel upon notice was not invalid, citing Long v. Foster & Assocs., 136 So. 2d 48 (La. 1961)).[17]

The plaintiffs have also directed us to several recent federal cases concerning arbitration agreements that contain change-in-terms clauses. Some of these decisions have

---

[17]  The majority opinion in Stadtlander did not explicitly analyze the change-in-terms provision, but the majority twice quoted the potentially problematic language, 794 So. 2d at 887, 889 n.9, and the dissent relied on that aspect of the contract, id. at 893 & n.2 (Peatross, J., dissenting).

27

invalidated arbitration agreements that give the company the right to alter the terms of the agreement at any time, at least when the company is not required to give notice of the change. See, e.g., Dumais v. Am. Golf Corp., 299 F.3d 1216, 1219 (10th Cir. 2002) (citing cases). Such cases reason that the company, having reserved to itself the right to change or to eliminate its obligation, has not really bound itself at all. Here, however, the defendant companies are required to give the customer notice of the proposed change. See Morrison v. Circuit City Stores, Inc., 317 F.3d 646, 668 (6th Cir. 2003); Pierce v. Kellogg, Brown & Root, Inc., 245 F. Supp. 2d 1212, 1215 (E.D. Okla. 2003) (both rejecting challenges to arbitration clauses containing change-in-terms provisions and distinguishing prior decisions in which the company was not required to give notice of the change).

The change-in-terms provisions in the contracts before us do not render the contracts' obligations illusory. The notice of the change in terms can be understood as an invitation to enter into a relationship governed by the new terms. The customer then accepts the new terms by continuing to use the service.[18] Cf.

---

[18] Cingular's contract specifically provides that a customer who cancels after a change in terms would not be liable for any early-termination fees that might otherwise apply. Sprint's contract is not as clear in this regard, though counsel represented to us at oral argument that this is a month-to-month contract without a termination charge. If a customer was compelled to accept a burdensome change in the terms on pain of forfeiting a deposit or paying a termination fee, that might show that the attempt to change the terms was unconscionable or otherwise unenforceable. Cf. LA. CIV. CODE ANN. art. 1983

28

<u>Bank of La. v. Berry</u>, 648 So. 2d 991, 993 (La. App. 5 Cir. 1994) ("[A]s per the credit card agreement, the contract between the parties was perfected upon use of the card by [the customer].").

The fact that the company has the right to change the terms upon notice does not mean that the contract never bound it. Nor does the fact that the companies could later attempt to change the arbitration clause to render it oppressive mean that the arbitration clause, as it stands, is unconscionable.

        c.    <u>Bar on class actions (Cingular)</u>

Cingular's arbitration agreement contains provisions barring the arbitrator from ordering consolidation or class arbitration. The record does not reveal whether, in the absence of such a provision, there would otherwise be a realistic possibility that an arbitrator would order a class-wide proceeding; it may be that the contractual prohibitions merely make explicit what would otherwise happen in practice. In any event, the plaintiffs argue that the bar on collective proceedings has the effect of immunizing the defendants from low-value claims, no matter how meritorious those claims might be. The companies can accordingly wrong their customers with impunity, say the plaintiffs, so long as they do not harm any particular person to a degree that makes it worthwhile to pursue an arbitration case. The arbitration

---

(requiring that contracts be performed in good faith). But it would not mean that the original agreement never bound the company to anything.

29

clause is therefore not so much an alternative method of dispute resolution as it is a system for avoiding liability altogether.

While we do not discount the plaintiffs' complaints, our calculus also must take into account that both federal and Louisiana policy favor arbitration as a method of dispute resolution. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983) (noting the "liberal federal policy favoring arbitration agreements"); Thomas v. Desire Cmty. Hous. Corp., 773 So. 2d 755, 759 (La. App. 4 Cir. 2000) (en banc) (referring to the "strong public policy in Louisiana favoring the enforcement of arbitration clauses"). As the Supreme Court has explained, the fact that certain litigation devices may not be available in an arbitration is part and parcel of arbitration's ability to offer "simplicity, informality, and expedition," see Gilmer, 500 U.S. at 31 (internal quotation marks omitted), characteristics that generally make arbitration an attractive vehicle for the resolution of low-value claims. Moreover, this court recently rejected an argument that an arbitration clause prohibiting plaintiffs from proceeding collectively was unconscionable under Texas law. See Carter, 362 F.3d at 298, 301; accord O'Quin v. Verizon Wireless, 256 F. Supp. 2d 512, 519-20 (M.D. La. 2003) (applying Louisiana law). But see Ting, 319 F.3d at 1150 (holding that an arbitration agreement's bar on class-wide relief is unconscionable under California law).

A highly relevant factor in considering the equities of the arbitration clauses in this case is that the Louisiana Unfair Trade Practices Act (LUTPA), which is one basis of the plaintiffs' claims, does not permit individuals to bring class actions.  See LA. REV. STAT. ANN. § 51:1409(A) (authorizing an aggrieved individual to sue "but not in a representative capacity"); Morris v. Sears, Roebuck & Co., 765 So. 2d 419, 421-22 (La. App. 4 Cir. 2000).[19]  Although this prohibition does not apply to the plaintiffs' breach-of-contract cause of action, it does significantly diminish the plaintiffs' argument that prohibiting class proceedings in consumer litigation is unconscionable under Louisiana law.  Moreover, LUTPA does permit the state attorney general to sue on behalf of the state and its consumers and to pursue restitutionary relief on behalf of a class of aggrieved consumers.  LA. REV. STAT. ANN. §§ 51:1404(B), 1407, 1408, 1414; State ex rel. Guste v. Gen. Motors Corp., 370 So. 2d 477, 487 (La. 1978).  This further tends to show that the arbitration clause does not leave the plaintiffs without remedies or so oppress them as to rise to the level of unconscionability.

      d.   Confidentiality (Cingular)

---

[19]    LUTPA does, however, seek to make it feasible to vindicate low-value claims by providing for awards of attorneys' fees, which an arbitrator would presumably be empowered to award in enforcing a LUTPA plaintiff's substantive rights.  See LA. REV. STAT. ANN. § 51:1409(A); cf. Carter, 362 F.3d at 298-99.  We observe as well that Cingular's arbitration clause expressly permits customers to bring inexpensive small-claims actions.

Cingular's contract includes terms stating that the existence and result of any arbitration must be kept confidential.  (This restriction does not apply to actions in small claims court, which the agreement also permits.)  The district court was troubled by this feature of the agreement because it deprived plaintiffs of the ability to establish precedent.  The plaintiffs add that the confidentiality requirement, although neutral on its face, gives an informational advantage to the repeat-player companies, who have first-hand knowledge of how prior arbitrations against them have fared.  The plaintiffs again cite in support the Ninth Circuit's decision in Ting, which noted such considerations in holding unconscionable, as a matter of California law, a confidentiality provision in a consumer arbitration agreement.  See 319 F.3d at 1151-52.[20]

While the confidentiality requirement is probably more favorable to the cellular provider than to its customer, the plaintiffs have not persuaded us that the requirement is so

---

[20]    Although couched in terms of unconscionability, the plaintiffs' arguments relate more to broader considerations of public policy than to the harshness of a particular bargain. These particular plaintiffs might be better off if prior arbitrations had been public, and later plaintiffs might benefit if the confidentiality provision were invalidated in this case. The vice (if any) of the confidentiality clause lies mostly in its systematic effect, not in its oppressiveness as regards the particular plaintiffs before us.  The difference in emphasis is not of much moment, however, as the Louisiana courts recognize public policy (like unconscionability) as a basis for invalidating certain agreements.  See, e.g., Boudreaux v. Boudreaux, 745 So. 2d 61, 63 (La. App. 3 Cir. 1999).

32

offensive as to be invalid.  Confidentiality can be desirable to customers in some circumstances.  Cf. Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 170 F.3d 1, 8 n.4 (1st Cir. 1999) (observing, in an employment case, that both sides might prefer the confidentiality of arbitration); American Arbitration Association, Consumer Due Process Protocol, Principle 12(2) (April 17, 1998), at http://www.adr.org.  Indeed, the plaintiffs' attack on the confidentiality provision is, in part, an attack on the character of arbitration itself.  If every arbitration were required to produce a publicly available, "precedential" decision on par with a judicial decision, one would expect that parties contemplating arbitration would demand discovery similar to that permitted under Rule 26, adherence to formal rules of evidence, more extensive appellate review, and so forth--in short, all of the procedural accoutrements that accompany a judicial proceeding.  But part of the point of arbitration is that one "trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration."  Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985).  We note as well that the creation of precedent--one of the plaintiffs' main concerns--can cut both ways, since precedent can be helpful or harmful, depending on the decision.  Finally, a corporate repeat-player can use confidential settlements to prevent a court from making adverse findings, and, while confidential settlements are not

33

completely analogous to confidential arbitration, it is instructive that Louisiana law does not prohibit them.

        e.    <u>Discovery (Sprint)</u>

Plaintiff Landry, the only plaintiff in this case who is a Sprint customer, has complained on appeal of a clause that prohibits discovery requests. Landry did not advert to this aspect of the arbitration clause in his submissions in the district court. Not only does the failure to raise the matter in the district court invoke the rule that issues generally cannot be raised for the first time on appeal, <u>see</u> <u>Alford v. Dean Witter Reynolds, Inc.</u>, 975 F.2d 1161, 1163 (5th Cir. 1992), but it also means that Landry has not created the factual record that would be necessary to shoulder his burden of showing that the restriction would prevent him from vindicating his substantive rights. <u>See</u> <u>Carter</u>, 362 F.3d at 298-99.[21]

        f.    <u>Summary</u>

Having considered the challenged features of the Cingular and Sprint arbitration clauses, we have determined that the clauses are not unconscionable or otherwise unenforceable under generally applicable principles of Louisiana law. Cingular and

---

[21]    We express no view regarding whether the result of the arbitration could later be challenged on the ground that the restrictions on discovery frustrated Landry's ability to effectuate his substantive rights.

Sprint are therefore entitled to an order compelling arbitration and staying the judicial proceedings.  See 9 U.S.C. §§ 3-4.[22]

## IV. CONCLUSION

The plaintiffs' motion to dismiss the appeal for want of jurisdiction is DENIED.  We AFFIRM the district court's judgment to the extent that it denied Centennial's motion to compel arbitration.  We REVERSE the judgment to the extent that it denied the motions of Cingular and Sprint, and we REMAND the case to the district court for entry of an appropriate order compelling arbitration.

---

[22]     We note that Sprint requested that the district court compel arbitration and then dismiss, rather than simply stay, the judicial proceedings.  We leave it to the district court to determine whether such would be proper in this case.  Cf. Alford, 975 F.2d at 1164.