STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

CM 07-146 consolidated with CA 07-512

SUTTON STEEL & SUPPLY, INC., ET AL

VERSUS

BELLSOUTH MOBILITY, INC., ET AL

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 91421
HONORABLE GERARD B. WATTIGNY, DISTRICT JUDGE

**********

JOHN D. SAUNDERS
JUDGE

**********

Court composed of John D. Saunders, Jimmie C. Peters, and Glenn B. Gremillion, Judges.

**MOTION TO DISMISS DENIED. JUDGMENT OF THE TRIAL COURT AFFIRMED.**

Peter Butler, Sr.
Peter Butler, Jr.
Breazeale, Sachse & Wilson
909 Poydras St., #1500
New Orleans, LA 70112
(504) 433-9350
Counsel for Plaintiffs/Appellees:
Sutton Steel & Supply, Inc.
Kate Davis (on behalf of class action)
Kate Davis

**Gary Jude Russo**
**Perret Doise, APLC**
**P. O. Box 3408**
**Lafayette, LA 70502-3408**
**(337) 262-9000**
**Counsel for Defendant/Appellant:**
**Bellsouth Mobility, Inc.**

**Bob F. Wright**
**Domengeaux, Wright, Roy, & Edwards**
**556 Jefferson Street, Suite 500**
**Lafayette, LA 70501**
**(337) 233-3033**
**Counsel for Plaintiffs/Appellees:**
**Sutton Steel & Supply, Inc.**
**Kate Davis (on behalf of class action)**
**Kate Davis**

**Jonathan B. Andry**
**The Andry Law Firm, LLC**
**610 Baronne St.**
**New Orleans, LA 70113**
**(504) 586-8899**
**Counsel for Plaintiffs/Appellees:**
**Kate Davis**
**Sutton Steel & Supply, Inc.**
**Kate Davis (on behalf of class action)**

**Lionel H. Sutton, III**
**The Sutton Law Firm**
**610 Baronne St.**
**New Orleans, LA 70113**
**(504) 586-8899**
**Counsel for Plaintiffs/Appellees:**
**Kate Davis**
**Sutton Steel & Supply, Inc.**
**Kate Davis (on behalf of class action)**

**Seamus C. Duffy**
**Drinker, Biddle, & Reath, LLP**
**One Logan Square**
**18th & Cherry Streets**
**Philadelphia, PA 19103**
**(215) 988-2700**
**Counsel for Defendant/Appellant:**
**Bellsouth Mobility, Inc.**

**Evan M. Tager**
**Mayer, Brown, Rowe, & Maw, LLP**
**1909 K Street NW**
**Washington, DC 20006**
**(202) 263-3000**
**Counsel for Defendant/Appellant:**
**Bellsouth Mobility, Inc.**

**SAUNDERS, Judge.**

This class action case is before us in the posture of a consolidated motion to dismiss an unlodged suspensive appeal and an appeal for review of the trial court's judgment denying a motion to decertify the class. For the reasons outlined below, we deny the motion to dismiss and affirm the judgment of the trial court.

**FACTS:**

BellSouth Mobility Inc. (hereinafter "BellSouth") provided wireless telephone service to customers in Louisiana and other states pursuant to a written form contract containing standard terms and conditions. While the standard form contracts are not identical for each customer, the provisions at issue are substantially similar throughout. In particular, the face of each such contract provides for a certain number of "air time minutes included per month." In addition, there is a provision on the reverse of each contract which purportedly explains BellSouth's practice of rounding up the actual time used by a customer during each phone call to the next whole minute for purposes of billing. The member plaintiffs comprising this class action (hereinafter "the plaintiffs") allege that BellSouth breached its contractual promise to provide the bargained-for amount of "air time minutes" by rounding up, thereby charging the plaintiffs for phone time not actually used. BellSouth contends that the "rounding up" provision simply defines or clarifies what is meant by "air time minutes," and that its customers consented to this provision by signing the front of the agreement.

Since 1998, the terms and conditions of BellSouth's standard form contracts have also included a provision compelling the resolution of disputes related to the contract via arbitration. As with the "rounding up" clauses, BellSouth argues that these arbitration clauses became part of its agreement with its customers upon their

signing the front of the contract. As such, BellSouth contends that the current class action litigation is improper. The plaintiffs counter that such arbitration clauses never became part of the agreement, as they are unenforceably adhesionary,

**PROCEDURAL HISTORY:**

This is the fourth time that this case has come before this court. The first, *Sutton Steel & Supply, Inc. v. BellSouth Mobility, Inc.*, 00-511 (La.App. 3 Cir. 12/13/00), 776 So.2d 589, *writ denied*, 01-152 (La. 3/16/01), 787 So.2d 316 (hereinafter "*Sutton I*"), came in the form of a writ application consolidated with an appeal of the trial court's ruling denying a motion to compel arbitration and to stay the proceedings. The second, *Sutton Steel & Supply, Inc. v. BellSouth Mobility, Inc.*, 03-1536 (La.App. 3 Cir. 6/9/04), 875 So.2d 1062, *writ denied*, 04-1654 (La. 11/15/04), 887 So.2d 478 (hereinafter "*Sutton II*"), came in the form of a writ application consolidated with an appeal of the trial court's judgment certifying a class and striking certain exhibits. The third, *Sutton Steel & Supply, Inc.*, 07-106 (La.App. 3 Cir. 3/30/07) (hereinafter "*Sutton III*") came in the form of an application for a supervisory writ.

The case at bar commenced in June 1999, at which time the plaintiffs brought this putative class action lawsuit before Judge Gerard Wattigny (hereinafter "Judge Wattigny") in the 16th Judicial District Court of Iberia Parish, alleging that BellSouth breached its service agreement with its customers via its practice of "rounding up" calls to the next whole minute for billing purposes. Relying on the arbitration clauses contained in such agreements, BellSouth moved to compel arbitration of the plaintiffs' disputes. The district court denied the motion in March 2000, and BellSouth appealed to this court. In *Sutton I*, 776 So.2d 589, we affirmed the

2

decision of the district court, holding that BellSouth's arbitration provision was adhesive and thus unenforceable.

BellSouth then moved for summary judgment. The district court denied the motion on February 13, 2003, holding that the rounding provision contained in BellSouth's standard form contracts was also unenforceably adhesive. The plaintiffs subsequently moved for class certification. The district court granted the motion on August 13, 2003, certifying a class consisting of BellSouth customers from nine states: Louisiana, Alabama, Florida, Georgia, Kentucky, Mississippi, Tennessee, North Carolina, and South Carolina. BellSouth again appealed to this court. In *Sutton II*, 875 So.2d 1062, we affirmed the certification of the class but remanded the case back to the district court, directing it to address certain inadequacies in its class definition.

On remand from this court, BellSouth moved to decertify the class. The district court denied the motion on December 27, 2006, and instead granted the plaintiffs' motion to broaden the class definition. Thereafter, BellSouth filed this appeal and filed an application to this court for a supervisory writ. We denied the writ application on March 30, 2007. *Sutton III*. As to the appeal, the plaintiffs filed a motion to dismiss. We deferred resolution of the motion to dismiss and ordered briefing on the merits.

**The Plaintiffs' Motion to Dismiss:**

The plaintiffs assert, via motion to dismiss, that the posture of the case at bar does not afford BellSouth the right to bring the suspensive appeal before us today. Specifically, the plaintiffs argue that the circumstances of the instant case do not bring it within the ambit of La.Code. Civ.P. art. 592(A)(3)(b), the provision by virtue

3

of which BellSouth contends its right to appeal lies.

Louisiana Code of Civil Procedure Article 592(A)(3)(b) provides:

> If the court finds that the action should be maintained as a class action, it shall certify the action accordingly. If the court finds that the action should not be maintained as a class action, the action may continue between the named parties. In either event, the court shall give in writing its findings of fact and reasons for judgment provided a request is made not later than ten days after notice of the order or judgment. A suspensive or devolutive appeal, as provided in Article 2081 et seq. of the Code of Civil Procedure, may be taken as a matter of right from an order or judgment provided for herein.

Here, the plaintiffs contend that La.Code Civ.P. art. 593(A)(3)(b) does not afford BellSouth the right to appeal the trial court's judgment dated December 29, 2006, in that the class certification in the case at bar actually took place on August 13, 2003. In effect, the plaintiffs argue that BellSouth is precluded from appealing the trial court's judgment of December 27, 2006, as that judgment was not an "order or judgment" of certification at all, but merely a modification of the definition pertaining to an already-certified class.

"Appeal is the exercise of the right of a party to have a judgment of a trial court revised, modified, set aside, or reversed by an appellate court." La.Code Civ.P. art. 2082. Louisiana Code of Civil Procedure Article 2162 governs the dismissal of appeals. That Article provides, in pertinent part: "An appeal can be dismissed at any time by consent of all parties, or for lack of jurisdiction of the appellate court, or *because there is no right to appeal*, or if, under the rules of the appellate court, the appeal has been abandoned." *Id.* (emphasis added). "It is well established law that appeals are favored by Louisiana courts, and unless the grounds urged for a dismissal are free from doubt, an appeal will be sustained." *Brock v. Tidewater Constr. Co.,* 318 So.2d 100, 102 (La.App. 3 Cir. 1975) (citing *Emmons v. Agric. Ins. Co.*, 158

4

So.2d 594 (La.1963); *Vidrine v. Am. Employers Ins. Co.*, 129 So.2d 284 (La.App. 3 Cir. 1961)). In addressing class certification rulings more specifically, this court echoed the general policy favoring appeal in *West v. G & H Seed Co.*, 01-1453 (La.App. 3 Cir. 8/28/02), 832 So.2d 274. There, we stated: "Certification of a class of plaintiffs is an interlocutory ruling, may create irreparable harm to defendants, and thus justifies appellate review. *Because any potential error in this judgment . . . cannot practically be corrected on appeal after trial on the merits, the defendants are allowed to appeal such certification.*" *Id.* at 281 (citations omitted) (emphasis added). Thus, unless the grounds urged by the plaintiffs clearly demonstrate BellSouth's lack of the right to appeal under La.Code Civ.P. art. 592(A)(3)(b), we must deny their motion to dismiss the appeal currently before us.

The plaintiffs contend that dismissal of BellSouth's appeal is justified clearly by the language employed by this court at an earlier juncture in this case. There, we declared:

> Notwithstanding, "because of a trial court's authority to redefine the class before a decision on the merits of the common issues, appellate courts often allow certification despite a finding that the definition is inadequate for one reason or another." Thus, the trial court may address these inadequacies on remand.

*Sutton II*, 875 So.2d at 1068 (citing *Duhe v. Texaco, Inc.*, 99-2002, p. 12 (La.App. 3 Cir. 2/7/01), 779 So.2d 1070, 1078, *writ denied*, 01-637 (La. 4/27/01), 791 So.2d 637). Based on this reasoning, we opted to uphold the trial court's class action certification despite finding the class action definition to be ambiguous and inadequate. The plaintiffs assert that, in keeping with the scenario described in *Sutton II*, the trial court here did not render an "order or judgment" deciding whether or not "the action should be maintained as a class action" in its decision of December

5

27, 2006, but merely addressed the inadequacies of the class definition in an already-certified class action. As a result, the plaintiffs argue, BellSouth cannot point to La.Code Civ.P. art. 592(A)(3)(b) as the locus of its right to appeal. We disagree.

The plaintiffs contend that La.Code Civ.P. art. 592 limits rigidly the right to appeal the certification of a class to the trial court's initial decision whether to certify the action as a class action, yet the language of that statute speaks in terms of whether the action should be "maintained" as a class action. Similarly, La.Code Civ.P. art. 592 elsewhere frames class certification as a fluid process:

> In the process of class certification, or at any time thereafter before a decision on the merits of the common issues, the court may alter, amend, or recall its initial ruling on certification and may enlarge, restrict, or otherwise redefine the constituency of the class or the issues to be maintained in the class action.

La.Code Civ.P. art. 592(A)(3)(c).

In light of the myriad points in the class certification process at which the trial court may opt to "alter, amend, or recall its initial ruling on certification," this court finds little justification for restricting a party's right to appeal class certification to the period immediately following the trial court's initial ruling thereon. Where, as here, a trial court is called upon to rule whether to "alter, amend, or recall its initial ruling on certification," whether or not the action "should be maintained as a class action" is precisely the matter placed at issue. As such, without regard to its proximity to the trial court's initial ruling on class certification, we hold that the denial of BellSouth's motion to decertify the class in the instant case is an appealable "order or judgment," as contemplated by La.Code Civ.P. 592(A)(3)(b). To hold otherwise would impede unnecessarily class action defendants' ability to address potential errors in class certification, as errors concerning class certification cannot practically be corrected

6

on appeal after trial on the merits. Moreover, holding differently also would run contrary to Louisiana courts' longstanding policy favoring appeals.

Notably, neither do the circumstances of the instant case mirror those of the scenario described in *Sutton II*. Whereas *Sutton II* discussed situations in which the trial court may allow certification of a class despite its recognition that the class definition is "inadequate for one reason or another," the challenge presented by the defendants in the case at bar is not directed primarily at the adequacy of the class definition. Rather, the gravamen of the defendants' argument here challenges the validity of the class certification—i.e., whether the suit at issue may continue in the form of a class action at all—in light of the allegedly controlling jurisprudence of *Aguillard v. Auction Management Corp.*, 04-2804 (La. 6/29/05), 908 So.2d 1, a case which emerged subsequent to the trial court's initial class certification ruling. Thus, in terms of its effect on Sutton's motion to dismiss this appeal, *Sutton II* bears little persuasive influence on this court's determination.

Accordingly, we find the plaintiffs' motion to dismiss BellSouth's suspensive appeal to be without merit, and thus we must deny it.

**BellSouth's ASSIGNMENT OF ERROR #1:**

In its first assignment of error, BellSouth asserts that the trial court's rejection of its motion to decertify the class in the instant case is inconsistent with the supreme court's holding in *Aguillard*, 908 So.2d 1. Specifically, BellSouth claims that *Aguillard*'s resolution of a circuit split in favor of the enforceability of arbitration agreements automatically renders enforceable the arbitration clauses contained in BellSouth's written form contracts, thus compelling members of the class, upon BellSouth's arbitration demand, to pursue contractual claims through individualized

7

arbitrations rather than allowing class members to cumulate such claims in a class action proceeding. We disagree.

The standard of review for class action certifications was outlined in *Oubre v. Louisiana Citizens Fair Plan*, 07-66, p. 3 (La.App. 5 Cir. 5/29/07), 961 So.2d 504, 508-09, *writ denied*, 07-1329 (La. 9/28/07), 964 So.2d 363:

> The standard of review for class action certifications is bifurcated. The factual findings are reviewed under the manifest error/clearly wrong standard, but the trial court's judgment on whether or not to certify the class is reviewed by the abuse of discretion standard. *Etter v. Hibernia Corporation*, 06-646 (La.App. 4 Cir. 2/14/07), 952 So.2d 782; *Boudreaux v. State, Dep't of Transp. and Dev.*, 96-0137 (La.App. 1 Cir. 2/14/97), 690 So.2d 114, 119. A trial court has wide discretion in deciding whether or not to certify a class. *Daniels v. Witco Corp.*, [03-1478 (La.App. 5 Cir. 6/1/04), 877 So.2d 1011, 1014, *writ denied*, 04-2287 (La. 11/19/04), 888 So.2d 205]; *Eastin v. Entergy*, 97-1094 (La.App. 5 Cir. 4/15/98), 710 So.2d 835, 838. Any errors to be made in deciding class action issues should be in favor of and not against maintenance of the class action, because a class certification order is subject to modification if later developments during the course of the trial so require. *Johnson v. E.I. Dupont deNemours and Co., Inc.*, 98-229 (La.App. 5 Cir. 10/14/98), 721 So.2d 41; *McCastle v. Rollins Environmental Services of Louisiana, Inc.*, 456 So.2d 612, 620 (La.1984).
>
> When reviewing the trial court's ruling regarding class certification, we do not consider whether plaintiffs' claims state a cause of action or have substantive merit, or whether plaintiffs will ultimately prevail on the merits. *Schexnayder v. Entergy Louisiana, Inc.*, 04-636 (La.App. 5 Cir. 3/29/05), 899 So.2d 107, 113, *writ denied*, 05-1255 (La. 12/9/05), 916 So.2d 1058. Rather, our task is to examine plaintiffs' legal claims and to determine only whether a class action is the appropriate procedural device in light of established Louisiana criteria. *Id.*

Here, BellSouth argues that the trial court abused its discretion in deciding not to decertify the class, because criteria established by *Aguillard*, 908 So.2d 1, frame a class action as an inappropriate procedural device for carrying out the plaintiffs' legal claims. In that case, the supreme court examined the validity of an arbitration clause contained within a consumer standard form contract governing participation

in a real estate auction, and, in so doing, also addressed for the first time the split between circuits regarding the enforceability of such arbitration agreements under a "contract of adhesion" analysis.  The supreme court outlined the substance of the circuit split in terms of policy: "While the Second and Fourth Circuits adopt a liberal policy favoring arbitration agreements, the First and Third Circuits adopt a conservative policy as to the enforceability of such agreements." *Id.* at 11.  In resolving the split, the supreme court favored the former of these two policies, articulating a general presumption in favor of arbitrability:

> Finally, addressing the determination of the enforceability of arbitration agreements under a contract of adhesion analysis, we hold that a presumption of arbitrability does exist . . .. We, therefore, adopt the United States Supreme Court's interpretation of the federal arbitration law.
>
> Accordingly, even when the scope of an arbitration clause is fairly debatable or reasonably in doubt, the court should decide the question of construction in favor of arbitration.  The weight of this presumption is heavy and arbitration should not be denied unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation that could cover the dispute at issue.  Therefore, even if some legitimate doubt could be hypothesized, this Court, in conjunction with the Supreme Court, requires resolution of the doubt in favor of arbitration.

*Id.* at 18. BellSouth thus contends that the presumption of arbitrability enunciated in *Aguillard* dictates the automatic abrogation of this court's determination in *Sutton I*, 776 So.2d 589, that the clauses calling for individual arbitrations were properly excluded from the form contracts at issue here, thus rendering a class action an inappropriate procedural device for pursuing the plaintiffs' claims.

In response, the plaintiffs cite *Easterling v. Royal Manufactured Housing, L.L.C.*, 07-192 (La.App. 3 Cir. 6/6/07), 963 So.2d 399.  There, this court was asked to decide, in light of *Aguillard*, whether a trial court properly excluded an arbitration agreement from a contract to sell a manufactured home.  In holding that the trial court

9

had acted properly, we noted:

> We acknowledge the presumption of arbitrability in the state and federal statutes. However, we do not believe that Congress or our state Legislature intended to find all arbitration agreements enforceable simply because they are written agreements, which appears to be [the defendant's] argument. That is, if there is a written arbitration agreement, no matter what it says, the case must go to an arbitrator. That is not what the law says. Rather, an accurate summary would state that (1) if there is a *valid* arbitration agreement, then (2) whether the particular complaints are referable to arbitration should be determined by the arbitrator.

*Id.* at 408; *see also Lafleur v. Law Offices of Anthoney G. Buzbee*, 06-466, p. 13 (La.App. 1 Cir. 3/23/07), 960 So.2d 105, 113 ("[W]hile we recognize that under federal and state law the weight of the presumption in favor of arbitration is heavy, we find no error in the trial court's conclusion that the arbitration provision in this . . . contract was adhesionary."). As these cases make clear, notwithstanding the new policy favoring arbitrability announced by *Aguillard*, the validity of arbitration agreements must still be made on a case-by-case basis. Thus, in order for BellSouth to prevail in its argument that the trial court abused its discretion in failing to decertify the class action, we must find that the trial court was manifestly in error in holding the arbitration clause specifically at issue here to be invalid as unenforceably adhesionary.

*Aguillard*, 908 So.2d 1, again proves instructive in providing a template for determining the enforceability of such arbitration agreements. There, the supreme court described generally the characteristics of an unenforceably adhesionary agreement:

> [T]he real issue in a contract of adhesion analysis is not the standard form of the contract, but rather whether a party truly consented to all the printed terms. Thus, the issue is one of consent.
> Consent is called into question by the standard form, small print, and most especially the disadvantageous position of the accepting party,

which is further emphasized by the potentially unequal bargaining positions of the parties. An unequal bargaining position is evident when the contract unduly burdens one party in comparison to the burdens imposed upon the drafting party and the advantages allowed to that party. Once consent is called into question, the party seeking to invalidate the contract as adhesionary must then demonstrate the non-drafting party either did not consent to the terms in dispute or his consent was vitiated by error, which in turn, renders the contract or provision unenforceable.

*Id.* at 10 (citing Saul Litvinoff, *Consent Revisited: Offer Acceptance Option Right of First Refusal and Contracts of Adhesion in the Revision of the Louisiana Law of Obligations*, 47 LA. L. REV. 699, 758 (1986-1987); La.Civ.Code art. 1927; La.Civ.Code art. 1949). Later, addressing specifically whether an *arbitration clause* was unenforceably adhesionary, *Aguillard* appeared to distill its analysis into four subheadings: (1) the physical characteristics of the arbitration clause, (2) the distinguishing features of the arbitration clause, (3) the mutuality of the arbitration clause, in terms of the relative burdens and advantages conferred by the clause upon each party, and (4) the relative bargaining strength of the parties. *Id.* at 16-17.

Applying the reasoning of *Aguillard* to the instant case, then, in order to determine whether the arbitration clause at issue here is unenforceably adhesionary, we must measure it against the benchmark of *Aguillard*'s four-factor analysis.

First, when compared to those present in *Aguillard*, the physical characteristics of the arbitration clause here support the trial court's finding that the clause is unenforceably adhesionary. In *Aguillard*, although the supreme court noted that the arbitration clause at issue there was typed in "relatively small print," the court went on to frame the crux of this factor as a question of reasonableness, observing: "Moreover, the print is not unreasonably small." *Id.* at 16; *see also Lafleur*, 960 So.2d at 112 ("While we agree that the print size is small, we do not find that it is

11

unreasonably small."). By contrast, in its reasons for judgment, the trial court characterizes the font size employed in the instant case as being decidedly unreasonable, going so far as to call it virtually unreadable. Further, in describing previously the physical characteristics of BellSouth's arbitration clause, this very court intimated a similar lack of regard for the reasonableness of the font size used: "[T]he clause is on BellSouth's standard form and is in *exceedingly small print*." *Sutton I*, 776 So.2d at 596 (emphasis added). Thus, with respect to the first of *Aguillard*'s four factors of analysis, the physical characteristics of the arbitration clause contained in BellSouth's standard form contract support the trial court's finding that it is unenforceably adhesionary.

Secondly, again as compared to those found in *Aguillard*, the relative dearth of distinguishing features of the arbitration clause in the instant matter further supports the trial court's finding that the clause is unenforceably adhesionary. In finding that the distinguishing features of the arbitration clause in *Aguillard* weighed in favor of enforceability, the supreme court noted: "In this case, the arbitration provision, although not distinguished, was not concealed in any way, but rather was contained in a single sentence paragraph separated from the preceding and following paragraphs by double spacing." *Aguillard*, 908 So.2d at 16. Here, the arbitration clause at issue similarly lacks distinction from the other clauses in the form contract. Quite dissimilarly, however, the arbitration clause here is not set off from the preceding and following paragraphs by double spacing. Moreover, as the plaintiffs note in their brief, the sheer volume of words contained in BellSouth's form contract additionally exacerbates the difficulty of directing one's attention to the arbitration clause therein. Whereas the page on which the arbitration clause appeared in

12

*Aguillard* contained roughly 700 words, the page on which the clause appears in the instant matter contains at least 3,960 words.[1] The cumulative effect of these features is to cloak the arbitration clause within a blanket of boilerplate language. As such, while this court is hesitant to conclude that BellSouth actively "concealed" the arbitration clause, neither do we feel justified in declaring the district court's arrival at such a conclusion to be unreasonable. Thus, the second *Aguillard* factor lends additional support to the trial court's finding that the arbitration clause is unenforceably adhesionary.

Third, the lack of mutuality found in this case additionally fortifies the trial court's finding that the arbitration clause at issue here is unenforceably adhesionary. In finding that the arbitration clause at issue in *Aguillard* did not lack sufficient mutuality to invalidate the clause as adhesionary, the supreme court reasoned: "[W]e find the arbitration clause severely limits *both* the defendants' and the plaintiff's right to litigate. Nowhere in the document do the defendants reserve to themselves the right to litigate any issue arising from the contract . . . ." *Id.* (emphasis added). Unlike *Aguillard*, however, the arbitration clause at issue here does not limit the right to litigate for both parties. On the contrary, although the clause purports to limit the plaintiffs' options solely to arbitration, it grants BellSouth the option to pursue other remedies, including litigation. Further, as the plaintiffs note in their brief, the clause here also prohibits the arbitrator from ordering "consolidation or class arbitration." BellSouth argues in its brief that the lack of mutuality found in the instant case cannot by itself render an arbitration agreement unenforceable, yet, as *Aguillard* makes clear,

---

[1] The amount of words actually contained on the page is in dispute. 3,960 words is the lesser of the two amounts asserted; the plaintiffs claim that the contract contains 4,182 words on the page.

13

non-mutuality of this sort stands as an important factor in contract of adhesion analysis. While such a limitation standing alone may not be enough to invalidate the clause, its effect is to additionally limit the options available to potential claimants, such as the plaintiffs, without any concomitant burdening of BellSouth's freedom of action. Thus, the third prong of *Aguillard*'s four-factor test also weighs in favor of the trial court's conclusion that the clause is unenforceably adhesionary.

Finally, the inequality of relative bargaining positions found between the plaintiffs and BellSouth still further strengthens the trial court's finding that the arbitration clause in question here was unenforceably adhesionary. In addressing this factor in *Aguillard*, the supreme court remarked:

> [I]t does not appear that there was such a difference in bargaining positions between the parties so as to justify the application of the principle of contract of adhesion to the arbitration clause . . ..[T]he underlying transaction, a real estate auction, does not indicate that it was such a necessary transaction to establish the plaintiff was compelled to enter it . . ..[E]ach party was strictly limited to arbitration for dispute resolution, and if the plaintiff did not agree with the terms of arbitration or the terms in general, he could have either attempted to negotiate the terms of the contract or refused to participate in the auction.

*Id.* at 16-17. Here, however, no such freedom to bargain existed for the plaintiffs. As evidenced by the testimony of BellSouth's corporate representative, it was BellSouth's company policy that the arbitration clause contained in its standard form contract was not subject to negotiation with individual consumers. Moreover, as demonstrated by BellSouth's repeated willingness to dispense with arbitration provisions in its dealings with non-consumers, neither is BellSouth's refusal to negotiate out of such provisions with consumers merely the implementation of an across-the-board policy. BellSouth's willingness to negotiate the inclusion or exclusion of its arbitration provision appears to be a direct function of the relative

bargaining power possessed by the party with which it is bargaining. As such, the relative inequality of bargaining positions between BellSouth and the plaintiffs in the instant case is paradigmatic of that normally present in a contract of adhesion. Thus, the final *Aguillard* factor lends further support to the trial court's determination that the arbitration clause at isssue here is unenforceably adhesionary.

Based on our application of *Aguillard*'s four-factor test to the arbitration clause at issue here, we hold that the trial court was not manifestly in error in holding the arbitration provision of BellSouth's standard form consumer contract to be unenforceably adhesionary. Accordingly, we also find BellSouth's assertion that, in light of *Aguillard*, the trial court abused its discretion in rejecting BellSouth's motion to decertify the class action to be without merit.

We also note here that BellSouth includes as part of this assignment of error the argument that because many class members subsequently entered into contracts containing fully mutual arbitration agreements with BellSouth's successor-in-interest, Cingular Wireless, those arbitration agreements remain enforceable even if, as this court now holds, the arbitration agreements contained in BellSouth's standard consumer form contracts are unenforceably adhesionary. BellSouth reasons that, at the very least, none of the class members who entered into such agreements with Cingular Wireless may be included in the certified class here, as the later arbitration agreements are worded in such a way as to embrace retroactively prior disputes between those consumers and Cingular Wireless, including Cingular's predecessors-in-interest.

In support, BellSouth cites *Lakeland Anesthesia, Inc. v. United Healthcare of Louisiana, Inc.*, 03-1662 (La.App. 4 Cir. 3/17/04), 871 So.2d 380, *writs denied*, 04-

969 (La. 6/25/04), 876 So.2d 834 and 04-972 (La. 6/25/04) 876 So.2d 834. There, in determining whether an arbitration provision contained in an agreement between medical professionals and a health management organization applied retroactively to disputes arising before the agreement was confected, the fourth circuit stated: "Broadly worded arbitration provisions lacking a temporal restriction can be retroactively applied to disputes having their origins in actions pre-dating the execution of the agreement containing such provisions." *Id.* at 392. BellSouth thus urges this court to apply *Lakeland* to exclude from the action any class members who entered into agreements with Cingular Wireless subsequent to their contracting with BellSouth. We must decline to do so.

BellSouth places great persuasive weight on *Lakeland*, yet the issue presented by that case is quite removed from that presented by the case at bar. In *Lakeland*, the primary question was whether the wording of an arbitration provision could be sufficiently broad to apply retroactively. In answering that question in the affirmative, the fourth circuit established the proposition that not all arbitration provisions must operate solely on a prospective basis. Importantly, however, the *Lakeland* court based their holding, in part, on the continuity of the business relationship between the parties to the arbitration agreement:

> Another factor we find relevant in this case is that the relationship between the parties has been a continuous one. Indeed, Dr. Hightower attests in his affidavit that is in the record that he had a previous contractual relationship with United. For this reason, it makes logical sense to read a broad arbitration clause in the later Hightower Agreement, which expressly provides that it covers "any disputes about their business relationship" and also provides that it supercedes all prior agreements between the parties, as encompassing the entirety of the parties' ongoing relationship.

*Id.* Rather than involving an arbitration agreement confected after the

16

commencement of a still-ongoing business relationship, however, the instant case involves an arbitration agreement entered into by consumers after the conclusion of a prior business relationship with one entity and at the commencement of a second relationship with another entity not even a party to the action. Nevertheless, BellSouth asks this court, almost solely on the basis of *Lakeland*, to eject class members from a suit with BellSouth as a consequence of their completely unrelated dealings with Cingular Wireless. Without more, we are loathe to stretch the relatively innocuous holding of *Lakeland* to achieve such a staggering result. Thus, we find BellSouth's first assignment of error to be wholly lacking in merit.

**BellSouth's ASSIGNMENT OF ERROR #2:**

BellSouth next argues that the trial court's order declining to decertify the class action additionally violates *Aguillard*'s mandate that a contractual provision cannot be held unenforceably adhesionary unless the party challenging the term proves that he or she did not consent to it. BellSouth contends that as such a burden engenders inherently individualized inquiries, the trial court erred in holding that the class action here is an appropriate procedural device to pursue the plaintiffs' disputes. We disagree.

BellSouth again misreads the thrust of *Aguillard*. According to BellSouth, the language employed by the supreme court in its general discussion of contracts of adhesion compels a two-stage analysis before an agreement may be invalidated as adhesionary:

> Consent is called into question by the standard form, small print, and most especially the disadvantageous position of the accepting party, which is further emphasized by the potentially unequal bargaining positions of the parties. An unequal bargaining position is evident when the contract unduly burdens one party in comparison to the burdens imposed upon the drafting party and the advantages allowed to that

17

party. Once consent is called into question, the party seeking to invalidate the contract as adhesionary must then demonstrate the non-drafting party either did not consent to the terms in dispute or his consent was vitiated by error, which in turn, renders the contract or provision unenforceable.

*Aguillard*, 908 So.2d at 10. BellSouth would take this to mean that the application of *Aguillard*'s four-factor test to the form of the agreement serves as only the first of two steps in a contract of adhesion analysis, yet such a reading is possible only when the passage is taken out of context. As the preceding portion of the supreme court's discussion makes clear, however, rather than framing questions of form and of consent as separate prongs of an adhesion analysis, the passage upon which BellSouth relies merely highlights consent as the overarching emphasis of such analysis:

> [A]lthough a contract of adhesion is a contract executed in a standard form in the vast majority of instances, not every contract in standard form may be regarded as a contract of adhesion. Therefore, we are not willing to declare all standard form contracts adhesionary; rather, we find standard form serves merely as a possible indicator of adhesion.
> As recognized by Litvinoff, the real issue in a contract of adhesion analysis is not the standard form of the contract, but rather whether a party truly consented to all the printed terms. Thus, the issue is one of consent.

*Id.* (citations omitted). When taken within the context of *Aguillard*'s generalized discussion of the roles of form and consent, then, the passage to which BellSouth points simply reinforces the notion that lack of consent, rather than deficiencies in form, is the determinative element of a contract of adhesion. Outside of this generalized discussion, there is little in *Aguillard* to suggest that separate questions of individualized consent necessarily must be answered before an otherwise adhesionary contract may be invalidated as unenforceable. Indeed, the supreme court declined to engage in any such inquiry in analyzing the arbitration clause at issue in *Aguillard*, but instead mirrored the approach of the trial court in constraining its

18

analysis to the application of its four-factor test to the arbitration clause:

> After careful review of the terms of the arbitration clause, we find nothing sufficient to establish the defendants were in such a superior bargaining position as to render the plaintiff a far weaker party or the contract adhesionary, *nor do we find anything in the document itself that would call into question the validity of plaintiff's consent to the terms of the agreement as indicated by his signature.*

*Id.* at 17 (emphasis added).

BellSouth suggests that this court should interpret *Aguillard* as requiring a determination as to consent wholly separate from the analysis of the agreement itself before a contract of adhesion inquiry is complete, yet not even the *Aguillard* court felt the need to so bisect its discussion of the arbitration provision at issue there. Further, whereas *Aguillard* dealt with a dispute embodied in a single action, the instant matter involves the cumulation of several disputes in the form of a class action. As such, expanding *Aguillard* to require individualized determinations as to consent would have potentially serious ramifications. Were this court to apply the expansive reading of *Aguillard* suggested by BellSouth to the class action context, actors with superior bargaining power would have carte blanche to form otherwise adhesionary arbitration agreements on a wide scale; as long as the financial hardships of litigation outweighed the damages owed for an otherwise meritorious individual contract claim, the impossibility of class action litigation would protect the very behavior that the contract of adhesion doctrine is meant to prevent.

Moreover, as previously discussed, such a result is not warranted by *Aguillard*. Accordingly, we find BellSouth's second assignment of error without merit.

**BellSouth's ASSIGNMENT OF ERROR #3:**

In its third assignment of error, BellSouth argues that the district court erred in applying Louisiana law to the claims of out-of-state class members in this multi-

state class action, thereby violating the Due Process Clause of the Fourteenth Amendment and the Full Faith and Credit Clause of Article IV, § 1 of the United States Constitution.

In support of such contention, BellSouth cites *Allstate Insurance Co. v. Hague*, 449 U.S. 302, 101 S.Ct. 633 (1981). There, in discussing whether the Minnesota Supreme Court's choice of Minnesota's substantive law exceeded federal constitutional limitations, the United States Supreme Court proclaimed: "The lesson . . .is that for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary or fundamentally unfair." *Id.* at 312-13. Applying this proposition more specifically to the class action context, BellSouth further cites *Phillips Petroleum Co. V. Shutts*, 472 U.S. 797, 105 S.Ct. 2965 (1985). There, in determining that the Kansas Supreme Court overstepped constitutional bounds in applying Kansas's substantive law to a class action involving members residing in all 50 states, the Supreme Court reasoned: "Kansas must have a 'significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating state interests,' in order to ensure that the choice of Kansas law is not arbitrary or unfair." *Id.* at 821-22 (citing *Allstate*, 449 U.S. at 312-13). In effect, BellSouth argues that the district court erred in finding Louisiana's contacts with the claims of out-of-state class members to be sufficiently significant to justify the application of Louisiana's contract law to those claims, thus making such application "sufficiently arbitrary and unfair as to exceed constitutional limits." *Id.* at 822. We disagree.

Although BellSouth is correct in citing *Phillips* as the controlling authority for

choice-of-law questions in the class action context, that case makes clear that questions of "significant contacts creating state interest" come into play only after a threshold finding of conflict: "We must first determine whether Kansas law conflicts in any material way with any other law which could apply. There can be no injury in applying Kansas law if it is not in conflict with that of any other jurisdiction connected to this suit." *Id.* at 816. In *Phillips*, the Supreme Court pointed to such a conflict only after comparing the law of Kansas to that of several other jurisdictions connected to the class action and finding significant differences in the defendant's possible liability thereunder: "The conflicts on the applicable interest rates, alone . . . certainly amounted to millions of dollars in liability. We think that the Supreme Court of Kansas erred in deciding on the basis that it did that the application of its laws to all claims would be constitutional." *Id.* at 818.

By contrast, the instant matter presents no such "material" variation as to the liability imposed by the laws of the various member states. In fact, this court held as much previously in *Sutton II*, 875 So.2d 1062. There, in addressing the trial court's granting of the plaintiffs' motion to certify the class, we were called upon by BellSouth to determine the propriety of class certification in light of the purported variation among the laws of the states implicated in the class action. In his reasons for granting the certification motion, dated August 13, 2003, Judge Wattigny framed the issue of liability in this case in terms of generally applicable contract law:

> [A] multi-state class action may require consideration of how variance in state laws might affect adjudication of the case. *The common core issues in this case are contractual duty, breach of contract, and damages methodology. These three common issues with respect to which states' laws do not differ, predominate over other issues in the case.* The standard form contracts sought to be enforced in this case obligate BellSouth Mobility to supply a specific amount of air time for a specific price. Plaintiffs assert BellSouth Mobility failed to do this.

21

Plaintiffs assert that BellSouth Mobility breached its unambiguous duty to supply the specific amount of minutes. Plaintiffs assert that the failure is a breach under any state's law. *The breaches give rise to claims for damages that are measured under accepted principles that apply in each state. Plaintiffs in their brief have set forth the law in all the applicable states and each state provides that the unambiguous terms of contracts determine the parties contractual duties.* Therefore, the breached contracts' terms define BellSouth Mobility's obligations. *Since the pertinent contract terms are common to the class, the commonality of the states' contractual interpretive principles assures that common issues of law and fact will predominate with respect to BellSouth's contractual duty. Similarly, in all states the failure to perform the contractually assumed duty is a breach of contract.*

. . . The difference between what should have been billed and what was billed is a mathematical computation. Therefore, variations in state law, if any, will not affect the damages determination. A measure of damages in a breach of contract case is the amount of overpayment. Louisiana Civil Code art. 1994. Generally, damages for breach of contract are intended to place the plaintiff in the same position he would have been in had the defendant not breached the contract. This basic principle of law in Louisiana applies for all states which the Plaintiffs desire this certification of class action to apply in. Plaintiffs have briefed the law of each state in their memorandum, and the Court will not go forward with the applicable law as set forth therein. However, the Court agrees that the law on damages is basically the same in each state sought to be certified in this class action.

(Emphases added.) On appeal, BellSouth urged this court to reverse Judge Wattigny, pointing to inconsistencies among the member states' laws regarding unconscionability and arbitrability, as well as raising certain affirmative defenses. In siding with the district court, this court framed the differences argued by BellSouth as tangential to the common issue of contractual liability:

BellSouth avers that variances in state law governing unconscionability create an impediment to class action treatment, and points out that it is Plaintiffs' burden to prove that each state's legal standards are not incompatible. However, as the Plaintiffs have not made any allegations of unconscionability, they need not address the legal standards governing it. Furthermore, if the trial court chooses to employ such an analysis in order to analyze the contract, it has the discretion to create subclasses or to amend or restrict its definition of the class at anytime [sic].

Additionally, BellSouth argues that variances in state law governing the enforceability of the arbitration provisions in its contracts

22

create an impediment to class certification. This court, in a previous appeal, has already declined to recognize the arbitration provisions in the Plaintiffs [sic] contracts. Even assuming that the arbitration provisions are enforceable in one or more of the remaining eight states, this does not automatically render class action an inferior method of adjudicating the Plaintiffs' claims. The trial court has discretion to create subclasses based on the class members' resident states. Even assuming that the trial court would have to conduct more than one arbitrability analysis does not render a class action unmanageable *per se*, nor does it inevitably lead to a determination that common issues do not predominate in the entire action. Thus, we find that BellSouth's arbitrability argument is not a basis for finding an abuse of discretion in the trial court's decision to certify the class.

. . . .

Finally, BellSouth argues that its affirmative defenses of waiver, ratification, and the voluntary payment doctrine depend on individual facts and circumstances, defeating commonality. However, while these affirmative defenses may limit or bar a class member's ultimate recovery, *they will not affect the initial determination of BellSouth's liability*. As such, they apply to the issue of the Plaintiff's damages, not BellSouth's liability, and do not make class certification inappropriate under La.Code. Civ.P. 591(C).

*Id.* at 1069-70 (footnotes omitted) (emphasis added).

Thus, applying the wisdom of our holding from a previous posture of this very case, we hold that the district court did not err in applying Louisiana's contract law to the multi-state class action at issue here. BellSouth contends that *Phillips* should invalidate the trial court's application of Louisiana law to out-of-state class members, yet, unlike in *Phillips*, no material variations regarding the potential liability of the defendant, BellSouth, exist among the laws of the member states in the instant case. Rather, at issue here is a simple question of contractual breach: if BellSouth breached its obligations under the form contracts in question, its liability under Louisiana law will mirror that provided for by the law of any other member state. In his reasons for judgment associated with BellSouth's motion to decertify the class, dated December 27, 2006, Judge Wattigny echoed such rationale in again discussing the alleged variation among the laws of the member states: "Plaintiffs' claims are a [sic] breach

23

of contract claim. Whether a contract has been breached is a simple question of contract interpretation. This contract interpretation would not vary from state to state." Having already held in *Sutton II* that the application of Louisiana contract law to the facts of the instant case creates no conflict as to liability among the laws of the other jurisdictions connected with this class action, this court finds no reason to reverse itself now.

**BellSouth's ASSIGNMENT OF ERROR #4:**

In its final assignment of error, BellSouth asserts that the district court's refusal to enforce the arbitration clause at issue here interferes with the Federal Arbitration Act (hereinafter "FAA"). In particular, BellSouth contends that the discussions of mutuality and prominence employed by *Aguillard* violate the proscriptions of the FAA, in that the application of such analyses is constrained only to arbitration clauses. In effect, if *Aguillard* calls for the consideration of mutuality and prominence in evaluating the enforceability of arbitration clauses under Louisiana law, BellSouth argues that the FAA preempts such a rule. We disagree.

The FAA mandates that "[a]n agreement to arbitrate is valid, irrevocable, and enforceable, *as a matter of federal law* . . . 'save upon such grounds as exist at law or in equity for the revocation of *any* contract.'" *Perry v. Thomas*, 482 U.S. 483, 492 n.9, 107 S.Ct. 1652 (1987) (quoting 9 U.S.C. § 2) (internal citations omitted). "Thus state law, whether of legislative or judicial origin, is applicable *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts *generally*." *Id.* (second emphasis added). "Even when using doctrines of general applicability, state courts are not permitted to employ those general doctrines in ways that subject arbitration clauses to special scrutiny." *Iberia Credit Bureau, Inc. v.*

24

*Cingular Wireless LLC*, 379 F.3d 159, 167 (5th Cir. 2004).

BellSouth argues that the analysis employed by *Aguillard* in deciding whether the clause at issue there was unenforceably adhesionary is preempted by the FAA, in that *Aguillard*'s consideration of mutuality and prominence as factors of analysis is not applicable to contracts generally, but is limited to arbitration clauses. In examining *Aguillard*, however, there is nothing to suggest that the supreme court intended the analysis utilized there to be constrained solely to the context of arbitration clauses. On the contrary, the language employed by *Aguillard* frames the adhesion analysis used as applicable to clauses of all types: "[W]hether the contract is one of adhesion or one merely contained in a standard form, the enforceability *of certain clauses, usually of the small print variety*, may be questionable . . . ." *Aguillard*, 908 So.2d at 9 (emphasis added). Indeed, rather than announcing a new test specific to arbitration clauses, the *Aguillard* court was careful to indicate that it instead was mirroring the policy of the second and fourth circuits in extending the applicability of already-existing adhesion analysis to arbitration provisions: "Although this Court has never applied a contract of adhesion analysis to determine the enforceability and validity of an arbitration agreement, our circuit courts of appeal have extended this analysis to such situations." *Id.* at 11. BellSouth makes the mistake of inferring that, because *Aguillard* dealt specifically with the application of adhesion analysis to an arbitration clause, the proper application of such analysis must necessarily be limited only to arbitration clauses. The language of *Aguillard* does not bear out such an inference. Thus, there is little merit to BellSouth's contention that the analysis employed by *Aguillard* is specific to arbitration clauses.

Moreover, although BellSouth points to *Iberia*, 379 F.3d 159, as an example

25

of the preemption it now urges this court to find, the scenario presented by the instant matter is quite distinguishable from that case. In rejecting the argument that the type size used rendered the arbitration clauses at issue in *Iberia* unenforceably adhesionary, the Fifth Circuit clarified that state law could not require arbitration clauses to comport to special standards regarding prominence: "But the plaintiffs' type-size argument does not by itself show that the arbitration clause is invalid. . . . The FAA prohibits states from passing statutes that *require* arbitration clauses to be displayed with special prominence . . . and courts cannot use unconscionability doctrines to achieve the same result." *Id.* at 172 (citing *Doctor's Assoc. v. Casarotto*, 517 U.S. 681, 686-88, 116 S.Ct. 1652 (1996); *Perry*, 482 U.S. at 492 n.9 (1987)) (emphasis added). Although BellSouth would have this court invalidate *Aguillard* as requiring special prominence of the sort specifically disallowed in *Iberia*, it is important to note that *Aguillard* does not *require* anything in order for a contract clause to survive adhesion analysis. Instead, *Aguillard* employs four factors—none of which is dispositive, individually—as guideposts against which to measure enforceability. Under such analysis, circumstances may exist where an arbitration clause displayed with significant prominence may be declared unenforceably adhesionary, just as a provision rendered in even the most minuscule type may nonetheless be found enforceable. The same can be said for the other *Aguillard* factors: while each is relevant, none is required.

Within this context, BellSouth's objections to *Aguillard*'s considerations of prominence and mutuality are misplaced. Whereas the FAA guards against state law involving either special doctrines for arbitration clauses or general doctrines with heightened arbitration-specific standards, neither is present here. Thus, we find this

26

assignment of error to be without merit.

**CONCLUSION:**

For the foregoing reasons, this court denies the plaintiffs' motion to dismiss and affirms the decision of the district court. All costs are to be paid by BellSouth Mobility, Inc.

**MOTION TO DISMISS DENIED. JUDGMENT OF THE TRIAL COURT AFFIRMED.**